850 P.2d 724

IDAHO SCHOOLS FOR EQUAL EDU-CATIONAL OPPORTUNITY, an unin-corporated association of superinten-dents of schools; Moscow School District # 281; Cambridge School District # 432–J; Lapwai School District # 341; Mullan School District # 392; Potlatch School District # 285; Whitepine School District # 284; Kendrick Joint School District # 283; Kootenai School District # 274; Cascade School District # 422; St. Maries Joint School District # 41; Orofino Joint School District # 171; Grangeville Jt. School District # 241; Culdesac Joint School District # 342; Genesee Joint School District # 282; Highland–Craigmont Jt. Sch. Dist. # 305; Bruneau–Grandview Jt. Sch. Dist. # 365; Dietrich School District # 314; American Falls School District # 381; Rockland School District # 382; Valley School District # 262; Challis Joint School District # 181; Horseshoe Bend School District # 73; West Jefferson School District # 253; Council School District # 13; Midvale School District # 433; Garden Valley School District # 71; Richfield School District # 316; Cottonwood Joint School Dist. # 242; Brian Silflow and Ganel Silflow, by and through their parents, Dale and Patti Silflow, hus-band and wife; Donald Paul Crea, by and through his father, Gary Crea; Na-than Noah, Holly Noah and Jessie Noah, by and through their parents Kate and Randy Noah, husband and wife; Andy Cook, by and through his father Larry Prally; on behalf of them-selves and all other school people of the state of Idaho similarly situated; and Harry E. Davey, William H. Jones, Gainford Mix, Bob Clyde, Werner Branner and Gary Crea, citizens and taxpayers, Plaintiffs–Appellants,

and

Idaho Education Association, Plaintiff-in-Intervention–Respondent,

v.

Jerry L. EVANS, in his capacity as the Idaho State Superintendent of Public Instruction & as an ex officio member of the Idaho State Board of Education; Cecil D. Andrus, in his capacity as Gov-ernor of the state of Idaho; the Legisla-ture of the state of Idaho, by and through Michael D. Crapo as President Pro Tempore of the Senate and Tom Boyd as Speaker of the House; the Ida-ho State Board of Education, by and through Gary Fay, Roberta Fields, Di-ane Bilyeu, Coleen Mahoney, J. Ray Cox, Karl Shurtliff, and Keith Hinck-ley, as members of the Idaho State Board of Education, Defendants–Re-spondents.

Jonathan FRAZIER, Rebecca Frazier, Jennifer Frazier, and Robert Frazier, minors, by their next friends, John and Robin Frazier; Amy Clayton, Matt Clayton, Anna Clayton, and Kevin Clayton, minors, by their next friends Larry and Bonnie Clayton; Jacob Put-nam, Andrew Putnam, Amy Putnam, Leah Putnam, Melissa Putnam, and Matthew Putnam, minors, by their next friends Lawrence and Janet Putnam; Kyle Kinghorn, Matt Kinghorn, Layne Kinghorn, Janeen Kinghorn, Karen Kinghorn and Michael Kinghorn, mi-nors by their next friends Brent and Donna Jean Kinghorn; Ada County Jt. School Dist. # 2; Bannock County School Dist. # 25; Snake River School Dist. # 52; Blackfoot School District # 55; Shelley Joint School District # 60; Bonneville Joint School District # 93; Nampa School District # 131; Caldwell School District # 132; Middleton School District # 134; Preston Joint School District # 201; Emmett Joint School District # 221; Jefferson County

Joint School #251; Jerome Joint School District #261; Post Falls School District #273; Madison School District #321; Sugar Salem Jt. School District #322; Minidoka County Jt. School Dist. #331; Twin Falls School District #411; and Buhl Joint School District #412, Plaintiffs–Respondents,

and

Blaine County School District #61; Danielle Luber, Kristin Luber and Sarah Luber, by and through their parents, Stephen and Lorie Luber; John Reese and Ellen Reese, by and through their parents, Ron and Susie Reese; Heidi Poehling, Molly Poehling and Amy Poehling, by and through their parents Mike and Sharon Poehling; Brady Roark, Jennifer Roark and Hailey Roark, by and through their parents, Keith and Laurie Roark; Kimberly Mecham, Camille Mecham, Aubree Mecham and Morgan Mecham, by and through their parents Milo and Diane Mecham; Thomas Ryan Healy, by and through his mother Christina Van Beuren, on behalf of themselves and all other school children residing in and attending school in Blaine County; and Stephen Luber, Lorie Luber, Ron Reese, Susie Reese, Mike Poehling, Sharon Poehling, Keith Roark, Laurie Roark, Milo Mecham, Diane Mecham, and Christina Van Beuren, citizens and taxpayers, Plaintiffs–Intervenors–Respondents,

v.

The IDAHO STATE BOARD OF EDUCATION; Jerry L. Evans, in his capacity as Idaho State Superintendent of Public Instruction and as an ex-officio member of the Idaho State Board of Education; and the State of Idaho, Defendants–Respondents,

and

Idaho Schools for Equal Educational Opportunity, et als., (See Title Above for et als.), Defendants-in-Intervention–Cross Complainants–Third–Party Plaintiffs–Appellants,

and

Independent School District of Boise City, Defendant-in-Intervention–Respondent.

IDAHO SCHOOLS FOR EQUAL EDUC. OPPORTUNITY, et al., Plaintiffs–Respondents,

and

Idaho Education Association, Plaintiff-in-Intervention–Respondent,

v.

Jerry L. EVANS, et al., Defendants–Respondents.

Jonathan FRAZIER, et al., Plaintiffs–Respondents,

and

Blaine County School District #61, et al., Plaintiffs–Intervenors–Appellants,

v.

The IDAHO STATE BOARD OF EDUCATION, et al., Defendants–Respondents,

and

Idaho Schools for Equal Educ. Opportunity, et al., Defendants-in-Intervention–Cross Complainants–Third–Party Plaintiffs–Respondents,

and

Independent School District of Boise City, Defendant-in-Intervention–Respondent.

Nos. 19875, 19922 and 19923.

Supreme Court of Idaho,
Boise, September 1992 Term.

March 18, 1993.

Rehearing Denied May 6, 1993.

Givens, Pursley, Webb & Huntley, Boise, for Idaho Schools for Equal Educational Opportunity. Robert C. Huntley, Jr., argued.

Hawley, Troxell, Ennis & Hawley, Boise, for respondents Frazier, et al. Merlyn W. Clark, argued.

Hawley, Troxell, Ennis & Hawley, Ketchum, for Blaine County, et al. Rand L. Peebles, argued.

Larry EchoHawk, Atty. Gen., and William A. Von Tagen, Deputy Atty. Gen., Boise, for respondents Governor Andrus and the Idaho Legislature. William A. Von Tagen, argued.

Cantrill, Skinner, Sullivan & King, Boise, for respondent Boise City. Tyra H. Stubbs, argued.

BISTLINE, Justice.

Article 9, § 1 of the state constitution ("the education clause") provides:

The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools.

Article 1, § 2 of the state constitution provides in part:

All political power is inherent in the people. Government is instituted for their equal protection and benefit....

The plaintiffs in these consolidated cases allege that the current method of funding the public schools does not provide either a "uniform" system or a "thorough" system and, further, violates the equal protection clause.

## BACKGROUND

Public schools in Idaho are funded by a combination of local, state, and federal funds. The State partially or totally reimburses the districts for certain expenses (80% of costs of exceptional education personnel; 85% of transportation costs; and 100% of teacher retirement benefits, Social Security, and unemployment insurance). Money is also received from the State Educational Support Program. This program is funded by state revenues, allocated by a "support unit" formula and based on average daily attendance in the district. Each school district's portion is reduced by a projected "local contribution" equal to the money which would be collected by a .36% property tax levy by the school district. Because a school district with low assessed property value will collect less money than a district with high property values under the .36% formula, a low property value district contributes less money to the Educational Support Program fund than a high property value school district. The school district may also, with voter approval, raise more money through supplemental levies. Supplemental levies are used for both capital construction and day-to-day mainte-

nance and operations. As will be discussed in greater detail below, chartered school districts have greater authority to levy money than do non-chartered districts. Finally, a relatively small amount of a school district's budget comes from lottery proceeds and various federal programs.

The appellants in this case are the Idaho Schools for Equal Educational Opportunity ("ISEEO"), Blaine County School District ("Blaine"), and the Frazier group ("Frazier"). The respondents are the State of Idaho, by and through the Legislature and Governor ("State"), and the Boise City School District ("Boise").

ISEEO filed a lawsuit in Latah County alleging that the current system of funding public schools is unconstitutional because it does not provide a thorough education in that necessary resources are unavailable due to lack of money. The Frazier lawsuit was filed in Ada County, also alleging the funding system is not thorough. Frazier further alleged that the disparities in funding caused by the property-tax funded system results in a system that does not provide a uniform education and violates the equal protection clause. The ISEEO suit was moved to Ada County upon motion by the State. ISEEO and Blaine moved to intervene as party plaintiffs in the Frazier suit. Boise moved to intervene as a party defendant. These motions were granted. Eventually, the Frazier and ISEEO suits were consolidated.

The State and Boise moved to dismiss for failure of the plaintiffs to state a cause of action and for lack of standing. The district court granted the motion. All parties agree that the court, in its memorandum decision, held that: 1) the equal protection claims had been decided adversely to the plaintiffs in *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975), and 2) the uniformity claims had also been decided adversely to the plaintiffs in *Thompson.* The parties disagree about how the district court resolved the thoroughness question. The defendants argue that the Court held that *Thompson* decided the merits of the question adversely to the plaintiffs. The plaintiffs argue that the court did not consider the merits of the thoroughness question and instead abstained from deciding the question. The court also held that the taxpayer/citizen plaintiffs did not have standing to sue but further held that the other plaintiffs did have standing.

On appeal, the appellants argue that the district court misread *Thompson* and that the taxpayer/citizens do have standing to sue. The respondents claim *Thompson* mandates the dismissal of all the appellants' causes of action and that not only do the taxpayer/citizens lack standing but so do the other individuals and organizations involved in this suit.

## STANDARD OF REVIEW

■ The standard for reviewing a dismissal for failure to state a cause of action pursuant to I.R.C.P. 12(b)(6) is the same as the standard upon the grant of a motion for summary judgment. The non-moving party is entitled to have all inferences from the record and pleadings viewed in his/her favor, and only then may the question be asked whether a claim for relief has been stated. *Miles v. Idaho Power*, 116 Idaho 635, 637, 778 P.2d 757, 759 (1989).

## DISCUSSION

As noted above, this Court has previously considered a case similar to the one at bar. *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975). The resolution of the issues on appeal largely depends on the effect of *Thompson* on this case.

In *Thompson*, the Court reviewed the decision of the Fourth Judicial District Court, the Honorable J. Ray Durtschi, presiding. Judge Durtschi determined that "the present system [of school funding], with its heavy reliance on the ad valorem property tax, violate[s] Art. 9, Sec. 1, of the Idaho Constitution by failing to provide the requisite 'uniform system of public schools'" and ordered the defendants to restructure the school funding method. *Thompson*, 96 Idaho at 794, 537 P.2d at 636. Judge Durtschi, however, rejected the claim that the system violated the equal

protection clause. *Thompson,* 96 Idaho at 796, 537 P.2d at 638. On review, this Court reversed the order of the district court, finding that the system did not violate the education clause. The Court went on to hold that the funding system did not violate the state equal protection clause. *Id.*

For the reasons expressed below, we have concluded that *Thompson* and cases decided after *Thompson* mandate dismissal of the uniformity claim brought by the appellants and most of their equal protection claims but that they do not resolve the thoroughness claim, which was not litigated by the parties in *Thompson.* As to that issue, we have further concluded that the plaintiffs have alleged facts which, if proven at trial, would entitle them to relief. We also hold that the citizen/taxpayer plaintiffs do not have standing. Accordingly, we affirm the district court order in part, reverse it in part, and remand for further proceedings.

**1. Thompson Held That the System of School Funding Does Not Violate the "Uniformity" Requirement of the Education Clause.**

The appellants argue that *Thompson v. Engelking* should not be followed in that it is not a majority opinion or it is either distinguishable, inapposite, or wrongly decided. We disagree and conclude *Thompson* reaches the correct result and disposes of the appellants' claims that are based upon the "uniformity" language of art. 9, § 1.

█ In *Thompson,* the opinion for the Court was written by Chief Justice McQuade, who was joined by Justices McFadden and Shepard. Justices Donaldson and Bakes dissented. In addition to concurring, Justice Shepard wrote a specially concurring opinion in which Justice McFadden also joined. The appellants argue that in *Thompson,* the Chief Justice's opinion must be synthesized with Justice Shepard's specially concurring opinion in order to discern the view of the majority of the court. We disagree. The special con-

curring opinion of Justice Shepard only provides additional reasoning. The reasoning of the majority of three is contained in Chief Justice McQuade's opinion, which was joined by two other members and is the opinion of the Court. That is the portion of *Thompson* which has precedential effect.

The Court in *Thompson* held that a funding system which created unequal per student expenditures between school districts did not violate the education clause or equal protection clause:

> Art[icle] 9, and in particular, Sec. 1, does not guarantee to the children of this state a right to be educated in such a manner that *all* services and facilities are equal throughout the state.

96 Idaho at 805, 537 P.2d at 647. The Court went on to quote favorably from an opinion of the Washington State Supreme Court that defined a "uniform education" as one administered to "enable[ ] a child to transfer from one district to another within the same grade without substantial loss of credit or standing." *Thompson,* 96 Idaho at 810, 537 P.2d at 652 (*quoting Northshore School District No. 417 v. Kinnear,* 84 Wash.2d 685, 727, 530 P.2d 178, 202 (1974), *overruled on other grounds, Seattle School Dist. No. 1 of King County v. State,* 90 Wash.2d 476, 585 P.2d 71, 99 (1978)).

In sum, the appellants' attempt to distinguish their uniformity claim from the claim resolved in *Thompson* cannot prevail because they mistake the additional rationale of the special concurring opinion for the rationale of the Court's opinion.

█ Second, the appellants argue that if the *Thompson* Court did not construe the word "uniform" to mean substantially equal educational opportunities, we should take that opportunity to do so now. *See Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (1973) (construing "thorough and efficient"); *Rose v. Council for Better Educ.,* 790 S.W.2d 186 (Ky.1989) (construing "efficient"). We decline the appellants' invitation to extend the reach of *Thompson* because we continue to believe the uniformity requirement in the education clause re-

quires only uniformity in curriculum, not uniformity in funding.

**2. The Equal Protection Clause is Not Violated by the Current School Funding System.**

**a. Thompson has precedential effect.**

The appellants argue that the portion of *Thompson* which held the funding system did not violate the state equal protection clause need not be followed because it was *dicta.* In support, they point out that neither party in *Thompson* appealed Judge Durtschi's ruling that the equal protection clause was *not* violated and argue that, therefore, it was not necessary for this Court to reach the issue in order to render a decision.

■ This argument fails to take into account the fact that where an order of the district court is correct but based upon an erroneous theory, this Court will affirm upon the correct theory. *Andre v. Morrow,* 106 Idaho 455, 459, 680 P.2d 1355, 1359 (1984). This doctrine is sometimes called the "right result-wrong theory" rule. Idaho Appellate Handbook, pg. 3–24 (1985). Thus, even though we disagreed with Judge Durtschi's holding that the school funding scheme violated the uniformity requirement of the education clause, the Court could have still affirmed his order, if we thought the scheme violated equal protection. In fact, many pages of the respondent's brief in *Thompson* are devoted to arguing the equal protection claim. Brief of Marba C. Thompson, et. al, pg. 59–74. Thus, the Court needed to address the equal protection issue in order to fully decide the appeal, and the equal protection holding in *Thompson* has full precedential effect.

**b. Thompson reached the right result.**

■ The *Thompson* Court reviewed the plaintiffs' equal protection charge under the rational basis test and concluded the school funding system did not violate that standard. Under that test, the equal protection clause is violated only if a classification is based solely on reasons totally unrelated to the pursuit of the State's goals or only if no grounds can be advanced to justify the State's goals. *Olsen v. J.A. Freeman Co.,* 117 Idaho 706, 711, 791 P.2d 1285, 1290 (1990). The appellants claim *Thompson* should not be applied here because recent developments in equal protection doctrine have undermined the analysis in that case. This argument has three subparts. The first is that Idaho's funding system should be subject to the strict scrutiny test for purposes of the equal protection clause because education is a fundamental interest under the Idaho Constitution. Second, the appellants argue that if the strict scrutiny test is not applied then an intermediate scrutiny test should be used. Third, the appellants argue that even if only the rational basis test applies, plaintiffs are entitled to a trial as to whether the funding system satisfies the test.

We believe the result reached in *Thompson* as to the equal protection claim was a sound one and we continue to adhere to it.

This Court set out the proper procedure for resolving an equal protection clause argument in *Tarbox v. Tax Comm'n,* 107 Idaho 957, 695 P.2d 342 (1985):

> The first step in an equal protection analysis is to identify the classification which is being challenged. . . .
>
> The second step is to determine the standard under which the classification will be judicially reviewed.

*Tarbox,* 107 Idaho at 959, 695 P.2d at 344. The third step is to determine whether the standard has been satisfied. *See State v. Breed,* 111 Idaho 497, 500, 725 P.2d 202, 205 (Ct.App.1986).

■ The classifications here are: 1) those citizens who must pay higher tax rates than the norm or higher taxes than the norm in order to bring their local school district to the same level of funding as other districts because of the school funding equalization program, and 2) those students, parents, and school administrators who are receiving less than an equal amount of funding from the State. As to the taxpayer plaintiffs, the proper standard is easily determined. "The established rule in Idaho is that the rational basis test is the

appropriate standard of review of classifications made for tax purposes." *Tarbox v. Tax Comm'n,* 107 Idaho at 959, 695 P.2d at 344; *Sheppard v. State Dep't of Employment,* 103 Idaho 501, 504, 650 P.2d 643, 646 (1982).

The proper standard to apply to the second group is more difficult to identify. The appellants suggest that we apply the strict scrutiny standard, which requires that the State bear the burden of proving not only that it has a compelling state interest which justifies the classification but also that the discrimination is necessary to promote that interest. *State v. Missamore,* 119 Idaho 27, 33, 803 P.2d 528, 534 (1990); *Newlan v. State,* 96 Idaho 711, 713, 535 P.2d 1348, 1350 (1975). The appellants note that the United States Supreme Court has stated that a right is fundamental for purposes of federal equal protection analysis if that right is guaranteed in the federal constitution. *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 33, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973) (*Rodriguez* held that education was not a fundamental right under the federal equal protection clause.). The appellants conclude from the above that education should be considered a fundamental right for state equal protection analysis because it is expressly mentioned in art. 9, § 1.

First, we note that the *Thompson* Court rejected this same argument:

> The argument is advanced that under the strict scrutiny-compelling state interest test used by the United States Supreme Court in *Rodriguez,* our system of public school financing violates the equal protection clause of the Idaho Constitution. Its proponents contend that there exists a *substantive fundamental* right to education, based upon Art. 9, Sec. 1 of the Idaho Constitution.
>
> . . . .
>
> We believe this to be an inappropriate occasion to adopt for use by this Court in interpreting the Idaho equal protection clause, the two-tiered strict-scrutiny test used by the United States Supreme Court to initially scrutinize *Rodriguez....* Nor, are we inclined to adopt,

so as to dispose of this appeal, the definition of "fundamental right" as set forth in *Rodriguez,* i.e., a right explicitly or implicitly guaranteed by the Constitution.

*Thompson,* 96 Idaho at 803, 537 P.2d at 645.

Although, as the appellants correctly observe, this Court, in cases decided after *Thompson,* embraced the strict scrutiny analysis under our state constitution in cases where fundamental rights are involved (the "two-tiered strict scrutiny" test mentioned above), *see, e.g., Tarbox,* 107 Idaho at 959–60, 695 P.2d at 344–45; *Olsen v. J.A. Freeman, Co.,* 117 Idaho 706, 710, 791 P.2d 1285, 1289 (1990), we have never adopted the *Rodriguez* definition of fundamental rights. Instead of using the *Rodriguez* constitutional guarantee test, we have determined whether the right in question was fundamental on a case by case basis. Thus far, this Court has never held that the particular right at issue was a fundamental one but has stated in *dicta* that voting, procreation, and constitutional safeguards for persons accused of crimes are fundamental rights under the state constitution. *See Tarbox,* 107 Idaho at 960 n. 1, 695 P.2d at 345 n. 1 (*quoting Newlan,* 96 Idaho at 713, 535 P.2d at 1350); *see also State v. Breed,* 111 Idaho 497, 500, 725 P.2d 202, 205 (Ct.App.1986).

We have determined that it is time to partially abandon our case by case determination of whether a particular right asserted is fundamental. That approach provides no neutral criteria by which the Court can make that determination and could give the appearance of result-oriented decision making. Further, it gives no guidance to the lower courts when they are faced with making that determination.

■ We now hold that the "fundamental rights" found in our state constitution are those expressed as a positive right. We have considered but reject the appellants' suggestion that the *Rodriguez* definition of fundamental rights be adopted. Although the sections in our state constitution which impose a duty upon the government might be said to invest a derivative right in those

to whom the duty is owed, the inclusion of those derivative rights in our definition of fundamental rights would be overly broad. For example, art. 3, § 26 provides that the government should promote temperance and morality; however, this section does not create a positive right to the enjoyment of the same. This is not to say that the state constitution is the exclusive source of fundamental rights. As noted above, this Court has stated that procreation is a fundamental right, and the right to procreate is not explicitly mentioned in the state constitution. *See Tarbox*, 107 Idaho at 960 n. 1, 695 P.2d at 345 n. 1. Rights which are not directly guaranteed by the state constitution may be considered to be fundamental if they are implicit in our State's concept of ordered liberty.

■ In light of the above holding, we further hold that education is not a fundamental right because it is not a right directly guaranteed by the state constitution. Rather, art. 9, § 1 imposes a *"duty [upon] the legislature [ ]* to establish and maintain a general, uniform and thorough system of public, free common schools." (Emphasis added.) Art. 9, § 1, "[o]n its face, mandates action by the Legislature. It does not establish education as a basic fundamental right." *Thompson*, 96 Idaho at 806, 537 P.2d at 648.

> It should also be pointed out that the education article, setting forth the responsibilities of the state in regard to public education and establishing a fund to finance a portion of that system, is on a different plane than is, for example, Art. 1 of the Idaho Constitution, wherein the framers set forth fundamental rights guaranteed to the people by that constitution.

*Thompson*, 96 Idaho at 806 n. 50, 537 P.2d at 648 n. 50. In sum, we decline to apply the strict scrutiny standard in this case.

The appellants next argue that the intermediate scrutiny test should be applied. That test, sometimes called the "means-focus" test, has the court determine whether the legislation substantially furthers some specifically identifiable legislative end. *Jones v. State Bd. of Medicine*, 97 Idaho 859, 867, 555 P.2d 399, 407 (1976).

The appellants rely upon *State v. Reed*, 107 Idaho 162, 686 P.2d 842 (Ct.App.1984), in support of their claim that the intermediate test is applied in cases where the statute blatantly discriminates between classes *or* where there are especially important interests involved and there is legislation which creates unusually sensitive classes. That case, however, is distinguishable because it dealt with a federal equal protection claim. The Court of Appeals noted that the United States Supreme Court had applied the intermediate level of review to cases "where especially important, though not necessarily 'fundamental' interests are at stake and in cases where unusually sensitive, although not necessarily 'suspect,' classes have been created." *Reed*, 107 Idaho at 170, 686 P.2d at 850; *see also Missamore*, 119 Idaho at 33, 803 P.2d at 534 (discussing federal equal protection analysis). The *Reed* Court went on to observe that this Court in *Jones v. State Board of Medicine* and *Tarbox v. Tax Commission* had applied the intermediate scrutiny test only to those classifications which have discriminatory effects which are "blatant" or "apparent on their face." *Id.* Thus, the *Reed* Court perceptively pointed out the difference between the federal and state equal protection analysis as it pertains to the intermediate standard of review. As the appellants here have limited their equal protection argument to the state constitution, we need not apply the intermediate standard of review unless the discriminatory effects of the school funding system are either blatant or apparent on its face pursuant to *Jones* and *Tarbox*.

■ We have examined the statutes in question and have concluded that the only aspect of the funding scheme challenged by the appellants which blatantly discriminates is I.C. § 33–802. That statute treats chartered school districts differently than non-chartered school districts in their respective powers to levy additional taxes. Thus, as to this small part of the appellants' equal protection challenge, the intermediate standard of review applies.

As to the remainder of the appellants' equal protection challenge, there is no suspect class involved, nor fundamental right, and the statutes involved do not blatantly discriminate. Thus, the rational basis test is the proper standard of review of those portions of the school funding system.

 Having identified the classes and the appropriate standards of review, we now turn to the third part of the equal protection analysis: whether the standards have been met. As to those statutes which do not blatantly discriminate, we adhere to the holding in *Thompson* that they withstand scrutiny under the rational basis test.[1] *Thompson*, 96 Idaho at 803, 537 P.2d at 645. As to the challenge to I.C. § 33–802, we remand to the district court for reconsideration under the intermediate standard.

**3. Thompson Does Not Hold Whether the "Thoroughness" Requirement of the Education Clause Was Violated in That Case and Thus Does Not Foreclose The Plaintiffs' Suit.**

Notwithstanding our holdings above, we believe that the appellants have stated a claim upon which relief may be granted based on the thoroughness provision of art. 9, § 1. The *Thompson* Court was not asked to, nor did it, address the meaning of the word "thorough." Judge Durtschi only ruled that system did not provide a "uniform" education; that was the only ruling before the Court. To the extent that isolated phrases can be taken out of the *Thompson* opinion which make it appear that we there addressed the thoroughness question, those phrases are taken out of context and are not binding.

 The respondents argue that the Court should not involve itself in the complicated determination of what is a "thorough" education and that we should defer to the other branches of government in this matter. Mindful that "[a]rguments erupt at the drop of a hat as to what is or is not necessary in an educational system [and as

to] what is or is not a frill," *Thompson*, 96 Idaho at 814, 537 P.2d at 656 (Shepard, J. concurring), and that this Court is not well equipped to legislate "in a turbulent field of social, economic and political policy," *Thompson*, 96 Idaho at 798, 537 P.2d at 640, we decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us. That would be an abject abdication of our role in the American system of government.

> Passing on the constitutionality of statutory enactments, even enactment with political overtones, is a fundamental responsibility of the judiciary, and has been so since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1813).

*Miles v. Idaho Power*, 116 Idaho at 640, 778 P.2d at 762. Likewise we are fully confident that once we have fulfilled our constitutional duty to interpret the constitution "the other branches of government also will carry out their defined constitutional duties in good faith and in a completely responsible manner." *Seattle School Dist. No. 1 of King County v. State*, 90 Wash.2d 476, 585 P.2d 71, 88–89 (1978).

 Balancing our constitutional duty to define the meaning of the thoroughness requirement of art. 9 § 1 with the political difficulties of that task has been made simpler for this Court because the executive branch of the government has already promulgated educational standards pursuant to the legislature's directive in I.C. § 33–118. *See State Board of Education Rules and Regulations for Public School K-12*, IDAPA 08.02. We have examined those standards carefully and now hold that, under art. 9, § 1, the requirements for school facilities, instructional programs and textbooks, and transportation systems as contained in those regulations presently in effect, are consistent with our view of thoroughness. We believe that our acknowledgement of these standards appropriately involves the other branches of state gov-

---

1. The school funding system is substantially the same today as it was when *Thompson* was decided. If anything, the disparities which today exist between districts appear to be less significant than at the time *Thompson* was decided.

ernment while allowing the judiciary to hold fast to its independent duty of interpreting the constitution when and as required.[2]

■ Where the plaintiffs have stated a cause of action in alleging that the current funding system does not provide a thorough education, they are entitled to an opportunity to prove their allegations. Should the plaintiffs be able prove that they cannot meet the standards established by the State Board of Education, noted above, with the money provided under the current funding system they will have presented an apparent prima facie case that the State has not established and maintained a system of thorough education. Accordingly, we reverse the order of the district court dismissing the thoroughness claims.

**4. The Taxpayers/Citizens Do Not Have Standing to Sue.**

■ The district court dismissed a group of plaintiffs who sued as citizens of and taxpayers in a particular school district and not as students, parents of students, or school administrators. These plaintiffs alleged that they are adversely affected by the present funding system because they are forced to pay more property tax or pay at a higher tax rate than taxpayers in other school districts in order to maintain the same level of funding. For example, the taxpayers residing in Blaine County allege that, because of the high assessed property value in that county, the State deducts a larger portion of general funds under the "equalization" formula than from school districts with lower assessed values. Thus, the school district receives less State money and must collect more money from the local property owners than other school districts. On the other hand, the taxpayers from the Meridian School District allege that because of the low assessed property value in their district the school district must tax their property at a higher rate in order to raise the same amount of money that "property-rich" school districts raise with a lower tax rate. In sum, these plaintiffs assert the method of funding results in uneven funding between school districts and thus violates the uniformity and thoroughness requirements of the education clause and the equal protection clause.

The district court granted the respondents' motion to dismiss pursuant to our decision in *Miles v. Idaho Power Co.*, 116 Idaho 635, 778 P.2d 757 (1989). In *Miles* we held that in order to have standing, a party must have a "personal stake" in the outcome of the litigation. That is, a party must suffer a "distinct palpable injury" and there must be a "fairly traceable" causal connection between the claimed injury and the challenged conduct. 116 Idaho at 641, 778 P.2d at 736 (*quoting Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978)).

Applying this standard to the remaining thoroughness claim, we conclude that the citizen/taxpayers do not have standing. That claim does not attack the method of funding; it only challenges the amount of funding provided without regard to the method of obtaining that money. Thus, the taxpayer/citizens, who do not attend the public schools, do not have children there, and are not responsible for the operation thereof, do not suffer a "distinct palpable injury" as a result of the alleged lack of school funding.

■ *Miles*, moreover, requires the dismissal of the citizen/taxpayers as to the equal protection claim. The only remaining portion of that claim is the challenge to I.C. § 33–802, which treats non-chartered school districts less favorably than chartered school districts and since the citizen/taxpayers suffer no distinct injury from that different treatment they have no standing to sue under *Miles*.

---

**2.** Our holding of the consistency of the IDAPA standards, with a definition of thoroughness is limited to the standards as they exist today. We express no opinion as to whether the IDAPA standards would be consistent with that definition if the Board of Education were to amend them.

We affirm the district court's decision dismissing the citizen/taxpayers from the suit.

**5. ISEEO and the School Districts Have Standing and the Authority to Bring This Lawsuit.**

The State of Idaho argues that we can still affirm part of the district court's decision dismissing all the claims for reasons not used by the trial court, to wit: that 1) ISEEO lacks standing to bring these lawsuits, and 2) the school districts lack standing and authority to sue.

■ In support of the second claim the State cites us to authority which holds that a school district cannot sue its creator, the State. *East Jackson Pub. Schools v. State*, 133 Mich.App. 132, 348 N.W.2d 303 (1984). While we acknowledge the Michigan court has so held, we are unable to adopt that court's reasoning. The court in *East Jackson* rejected the argument that the school district's statutory power to "sue and be sued" did not give it authority to sue the state. 348 N.W.2d at 306 n. 11. This Court, to the contrary, has already held that the "sue or be sued" clause in I.C. § 33–301 was intended to allow the school districts to "prosecute any actions they might deem necessary for the protection and preservation of the school funds and property." This "unqualified grant of power ... carries with it all powers that are ordinarily incident to the prosecution and defense of a suit at law or in equity." *Independent School Dists. v. Common School Dists.*, 56 Idaho 426, 55 P.2d 144 (1936). As the school districts allege they are being deprived of the funds they are entitled to under art. 9, § 1, they have the authority under I.C. § 33–301 to maintain this suit.

■ Next the State argues that the districts do not have standing because they did not represent the rights of the students. Whether or not that is true is beside the point because the districts have the required "personal stake" in the outcome of the litigation. School districts have an interest in receiving enough money to provide a thorough education for their pupils.

Taking the school districts' allegations in the light most favorable to them, as we must, they are not currently receiving that money. Thus the school districts meet the *Miles* test in that they allege a distinct palpable injury (lack of adequate funds) that has a fairly traceable causal connection to the actions of the State (the amount of money allocated by the Legislature to education).

■ Finally, the State argues that the superintendents/members of ISEEO lack standing because they have not suffered a distinct palpable injury. We disagree. Like the school districts, the superintendents have alleged they cannot provide a thorough education to their charges due to lack of state funding. Thus they have individual standing under *Miles*. ISEEO, the association of superintendents, has standing because "an organization whose members are injured may represent those members in a proceeding for judicial review." *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); *see Glengary–Gamlin Protective Ass'n v. Bird*, 106 Idaho 84, 87, 675 P.2d 344, 347 (Ct.App.1983).

**CONCLUSION**

We affirm Judge Schroeder's dismissal of the causes of action which allege that the school funding system does not provide a "uniform" system of education. The dismissal of the equal protection claim is also affirmed, except to that part regarding the different treatment of chartered and non-chartered school districts. The dismissal of the Frazier and ISEEO causes of action which allege the funding system does not provide a thorough education is reversed. The order dismissing the taxpayer/citizens from this suit is affirmed. The case is remanded to the district court for further proceedings not inconsistent with this opinion.

JOHNSON and TROUT, JJ. concur.

McDEVITT, Chief Justice, concurring and dissenting.

I concur in the opinion of the Court, except for that portion of its discussion

appearing under part 2(b). It is there that the Court announces that "[w]e have determined that it is time to partially abandon our case by case determination of whether a particular right asserted is fundamental." *Idaho Schools For Equal Educ. Opp. v. Evans*, 123 Idaho 573, 581, 850 P.2d 724, 732 (1993). Further, the Court holds "that the 'fundamental rights' found in our state constitution are those expressed as a positive right." *Idaho Schools*, 123 Idaho at 581, 850 P.2d at 732. Finally, the Court further adds that "[r]ights which are not directly guaranteed by the state constitution may be considered to be fundamental if they are implicit in our State's concept of ordered liberty." *Idaho Schools*, 123 Idaho at 582, 850 P.2d at 733.

The Court's equal protection analysis stems from a narrow issue: whether education is a fundamental right under the Constitution of the State of Idaho, and, thus, entitled to the strict scrutiny level of review. Ultimately, the Court held that the holding of *Thompson v. Engelking*, 96 Idaho 793, 805, 537 P.2d 635, 647 (1975), that being education is not a fundamental right, controlled the question. *Idaho Schools*, 123 Idaho at 580, 582, 850 P.2d at 731, 733.

Judicial opinions "must be considered and construed in the light of the rule that they are authoritative only on the facts on which they are founded." *Bashore v. Adolf*, 41 Idaho 84, 88, 238 P. 534, 534 (1925). Furthermore, when this Court has commented on the Idaho Constitution in an opinion, we have held the comments to be "pure *dicta*" where the Constitution did not "play[ ] a role in the ultimate decision of the court." *Petersen v. State*, 87 Idaho 361, 365, 393 P.2d 585, 587 (1964). In the present case, the Court's restructuring of well-established Idaho equal protection law simply does not play a role in its ultimate holding. Thus, the Court's above-quoted holdings are *dicta*, and, consequently, "[t]his Court is not bound by such *dicta.* . . ." *City of Weippe v. Yarno*, 96 Idaho 319, 323, 528 P.2d 201, 205 (1974), citing *Petersen*, 87 Idaho 361, 393 P.2d 585 (1964); *Long v. State Ins. Fund*, 60 Idaho 257, 90 P.2d 973 (1939); and *Bashore*, 41 Idaho 84, 238 P. 534 (1925).

Instead of adhering to the resolution of the narrow issue before it, the Court has attempted to pen a "bright-line" rule for future fundamental right analyses. The proper course for this Court to take is to restrain itself from offering generalizations about the law, and to wait for the issue to present itself through oral argument, briefing, a lower court ruling, and proper preservation of the issue. Specifically, this Court should wait for a case to present itself wherein a fundamental right is contended, reach a holding, and apply the holding to *that particular alleged fundamental right.* It is simply not proper for this Court to reach holdings that are not required by the issues on which the opinion is founded.

BAKES, Justice pro tem. (following Retirement on Feb. 1, 1993), concurring in part and dissenting in part:

### I

I concur with Part 1 of the Court's opinion in which it upholds this Court's determination in *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975), that Article 9, § 1, of the Idaho Constitution, which provides that ". . . it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools," does not guarantee either that "all services and facilities are equal throughout the state," or that "equal amounts are expended per pupil." The Court in *Thompson* clearly stated:

Neither equal protection, nor Art. 9, Sec. 1, of the Idaho Constitution, require that the public schools be financed so that equal amounts are expended per pupil, subject only to such variables as geographic or demographic location.

In conclusion, we reject the arguments raised by respondents. We hold that the trial court erroneously interpreted the mandate of Art. 9, Sec. 1 of the Idaho Constitution. *The record does not demonstrate a failure by the Legislature to comply with its mandate to establish a*

*system of basic, thorough and uniform education; nor, does that record demonstrate an inadequacy of funding to maintain that system of education.* Therefore, the decision of the trial court is reversed.

96 Idaho at 811, 537 P.2d at 653 (emphasis added). The majority opinion correctly holds that, "We decline the appellants' invitation to extend the reach of *Thompson* because we continue to believe the uniformity requirement in the education clause requires only uniformity in curriculum, not uniformity in funding." [3] 123 Idaho at 579–80, 850 P.2d at 730–31. Accordingly, the Court is unquestionably correct when it concludes that the *Thompson* case correctly "disposes of the appellants' claims based upon the 'uniformity' language of Art. 9, § 1," although the *Thompson* opinion did not limit its ruling to only the uniformity language in Article 9, § 1.

## II

I also concur with that portion of Part 2 of the majority opinion which holds that the *Thompson* opinion is *res judicata* on the question of whether the statutory scheme for funding the common schools violates the equal protection clause of either the state or federal Constitution. The majority opinion correctly notes that the argument of the appellants in this case "fails to take into account the fact that where an order of the district court is correct, but based upon an erroneous theory, this Court will affirm upon the correct theory," *citing Andre v. Morrow,* 106 Idaho 455, 680 P.2d 1355 (1984). 123 Idaho at 580, 850 P.2d at 731. The majority opinion then points out that had there been another theory upon which the district court's decision could have been affirmed, such as the equal protection clause theory, the Court in the *Thompson* case would have applied the "right result-wrong theory" rule and affirmed the district court, albeit on the correct theory. However, the Court in *Thompson* reversed the district court, and therefore the majority is correct that the *Thompson* case authoritatively decided the equal protection issue, both based upon the "right result-wrong theory" rule, and upon the merits of the rational basis test analysis of the *Thompson* Court as recognized in Part 2(b) of the majority opinion.[4]

## III

However, I dissent from Part 3 of the Court's opinion in which the majority concludes that, "Thompson Does Not Hold Whether The 'Thoroughness' Requirement of the Education Clause Was Violated in That Case and Thus Does Not Foreclose The Plaintiffs' Suit." At 583, 850 P.2d at 734. The majority states that, "To the extent that isolated phrases can be taken out of the *Thompson* opinion which make it

---

3. The *Thompson* Court had quoted approvingly from the California Supreme Court to the effect that, " '[W]e have ruled only that the education system must be uniform in terms of the prescribed course of study and educational progression from grade to grade.' " 96 Idaho at 809, 537 P.2d at 651, *quoting Serrano v. Priest,* 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971).

4. However, in its equal protection analysis, the Court states: "We have determined that it is time to partially abandon our case by case determination of whether a particular right asserted is fundamental." At 581, 850 P.2d at 732. Although *dicta*, that statement is troubling, particularly given the fact that the Court does not indicate how future determinations of whether a particular right asserted is fundamental will be made. The statement that "rights which are not directly guaranteed by the state constitution may be considered to be fundamental if they

are implicit in our State's concept of ordered liberty," at 582, 850 P.2d at 733 suggests that there is a law higher than even the Constitution of the State of Idaho which protects the "concept of ordered liberty." Such a higher law, by its very nature, would be known only to judges, and then only after the fact. This Court in numerous prior cases has held that the legislature has plenary power, subject only to those limitations expressly, or by clear implication, contained in the Idaho Constitution. *State v. Dolan,* 13 Idaho 693, 92 P. 995 (1907); *Idaho Power Co. v. Blomquist,* 26 Idaho 222, 141 P. 1083 (1914); *Independent School Dist. v. Pfost,* 51 Idaho 240, 4 P.2d 893 (1931); *Koelsch v. Girard,* 54 Idaho 452, 33 P.2d 816 (1934); *Electors of Big Butte Area v. State Bd. of Education,* 78 Idaho 602, 308 P.2d 225 (1957); *Rich v. Williams,* 81 Idaho 311, 341 P.2d 432 (1959). The foregoing statements in the majority opinion are contrary to our prior case law and, furthermore, are *dicta*.

appear that we there addressed the thoroughness question, those phrases are taken out of context and are not binding." At 583, 850 P.2d at 734. That statement misses both the express and implied holding of the *Thompson* case.

First, the "right result-wrong theory" rule, relied on by the Court, at 583, 850 P.2d at 731 to support its analysis that the *Thompson* Court did decide the equal protection clause issue, has equal application to the so-called "thoroughness" requirement of Article 9, § 1. The district court in *Thompson* had held that the Idaho statutory scheme violated Article 9, § 1, and granted relief to the plaintiffs. The Court in *Thompson* reversed the district court and held that the statutory scheme for financing education did not violate Article 9, § 1, "with its mandate to establish a system of basic, *thorough* and uniform education." 96 Idaho at 811, 537 P.2d at 653. As the majority opinion correctly points out, 123 Idaho at 579–580, 850 P.2d at 730–31 by the *Thompson* Court's reversal of the district court, it of necessity had to rule not only upon the uniformity grounds, but any other "legal theory" which would have supported the trial court's ruling. The Court's opinion states that, "[E]ven though we disagreed with Judge Durtschi's holding that the school funding scheme violated the uniformity requirement of the education clause, the Court could have still affirmed his order if we thought the scheme violated equal protection." At 580, 850 P.2d at 731. The majority opinion then concludes that therefore the *Thompson* Court "needed to address the equal protection issue in order to fully decide the appeal and the equal protection holding in *Thompson* has full precedential effect." At 580, 850 P.2d at 731.

By the same parity of reasoning, if the statutory scheme in *Thompson* had violated the "thoroughness" provision of Article 9, § 1, of the Idaho Constitution, the Court would have affirmed the district court in *Thompson,* applying the "right result-wrong theory" rule. However, the Court in *Thompson* reversed the district court's decision and held that the statutory scheme did not violate Article 9, § 1. The *Thomp-*

*son* Court stated that, "The record does not demonstrate a failure by the Legislature to comply with its mandate to establish a system of basic, *thorough* and uniform education; nor, does the record demonstrate an inadequacy of funding to maintain that system of education. Therefore, the decision of the trial court is reversed." 96 Idaho at 811, 537 P.2d at 653 (emphasis added).

Given the "right result-wrong theory" rule of *Andre v. Morrow,* 106 Idaho 455, 680 P.2d 1355 (1984), relied on by the majority opinion, 123 Idaho at 580, 850 P.2d at 731, and given the fact that the Court in *Thompson* stated, not once but several times, that the statutory scheme does not violate Article 9, § 1, expressly reciting the "thorough" requirement, it is difficult to understand how the Court can state that the references to "thorough" in the *Thompson* opinion are taken out of context. Thus, even if the *Thompson* decision had not expressly ruled that the statutory scheme did not violate the thoroughness requirement of Article 9, § 1, the *Thompson* Court's decision to reverse the district court's ruling required the Court to consider the "thoroughness" issue under the "right result-wrong theory" rule, as the majority opinion holds with regard to the equal protection issue. *Andre v. Morrow, supra.*

However, the *Thompson* Court referred to the "thorough" requirement in Article 9, § 1, several times. For example, the Court noted the trial court's findings of fact required the State of Idaho "under the provisions of Art. 9, Sec. 1, of the Idaho Constitution to establish and maintain a general, uniform and thorough system of public, free common schools for all children in the state...." 96 Idaho at 795, 537 P.2d at 637. In answer to that finding, the Court in *Thompson* stated:

Art. 9, and in particular, Sec. 1, does not guarantee to the children of this state a right to be educated in such a manner that *all* services and facilities are equal throughout the State. Such a centralized system of education is not required by our Constitution. Our position is supported by an analysis of the circum-

stances surrounding the adoption of our constitution, its language, subsequent legislative and judicial history in connection with the education article, and ample, although conflicting, authority from appellate courts of other states that have dealt with this issue.

96 Idaho at 805, 537 P.2d at 647, emphasis in original.

The *Thompson* Court's opinion then quoted from the proceedings of the Idaho Constitutional Convention in determining what the original framers of the Constitution thought that the word "thorough" in Article 9, § 1, meant:

> "The *duty* of the state, Mr. President, is simply *the teaching the children of the community* the three R's—to learn to read, to write, and the rules of arithmetic, and *the duty of the state* ends right there....."

96 Idaho at 806, 537 P.2d at 648, *quoting* from 1 Constitutional Proceedings at 695 (emphasis in original). However, the *Thompson* Court then went on to point out that:

> But today, Parker's statement cannot be given its literal meaning. There is, at least in the context of our present society, more inherent in a *thorough* system of education than instruction in the three "R's". The constitution gives the Legislature plenary responsibility and duty to establish and maintain a uniform and thorough statewide system of education.

96 Idaho at 806, 537 P.2d at 648 (emphasis added). Again, the Court in *Thompson* stated:

> [W]e do not interpret [the prior cases] to say that Art. 9, Sec. 1 grants a fundamental right to education, whereby in keeping with some nebulous conceptualization of equal educational opportunities, the Legislature is obligated to establish a statewide system of financing so that each school district receives sufficient funds so that equal sums are expended per student throughout the state.

96 Idaho at 808, 537 P.2d at 650.

In its final pronouncement, the majority opinion in *Thompson* stated:

> The record does not demonstrate a failure by the Legislature to comply with its mandate to establish a system of basic, *thorough* and uniform education; nor, does that record demonstrate an inadequacy of funding to maintain that system of education.

96 Idaho at 811, 537 P.2d at 653.

Why would the *Thompson* Court have discussed the proceedings of the Constitutional Convention and Mr. Parker's reference to "thorough" meaning only the three "R's," and then saying that, "Parker's statement cannot be given its literal meaning," if the Court was not addressing the "thoroughness" issue? Accordingly, I believe the district court in this case was correct in dismissing the plaintiffs' complaint because the Court in *Thompson v. Engelking* had both expressly and impliedly, under the "right result-wrong theory" rule, held that the Idaho statutory scheme does not violate Article 9, § 1's, "mandate to establish a system of basic, thorough and uniform education."

IV

However, a majority of this Court having concluded that the *Thompson* case was not dispositive on the question of the "thoroughness" requirement of Article 9, § 1, the Court, in my view, fails to provide sufficient guidance so that the trial courts of this state can determine what the "thoroughness" obligation imposed upon the legislature by Article 9, § 1, is. In answering respondents' argument that the language in *Thompson* that this Court is not well equipped to define what a thorough educational system is, and that such a "turbulent field" should be left to the legislative and executive branches of government, the majority states, "[W]e decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us. That would be an object abdication of our role in the American system of government," *citing Miles v. Idaho Power Co.,* 116 Idaho 635, 778 P.2d 757 (1989). 123 Idaho at 583, 850 P.2d at 734. However, the Court then seems to do just that, stating that our

"duty to define the meaning of the thoroughness requirement of art. 9 § 1 ... has been made simpler for this Court because the executive branch of the government has already promulgated educational standards pursuant to the legislature's directive in I.C. § 33–118." At 583, 850 P.2d at 734. The Court then adopts that portion of the State Board of Education's rules and regulations for public school K–12, IDAPA 08.02, dealing with "school facilities, instructional programs and text books, and transportation systems." The Court then holds that the "thorough" requirement of Article 9, § 1, requires the state to meet those requirements.

For the reasons which the majority opinion itself describes, I have a great deal of difficulty allowing other branches of government to set the standard for determining the meaning of a provision of the Idaho Constitution. However, I have even more difficulty with the Court's conclusion that the word "thorough" in Article 9, § 1, constitutionalizes the State Board of Education's regulation requirements for "school facilities, instructional programs and textbooks, and transportation systems...." At 583, 850 P.2d at 734. State Board of Education regulation IDAPA 08.02 was not in the record before the trial court and is not part of the record on appeal. The copy in the Idaho State Law Library comprises nearly 200 pages, a substantial portion of which involves school facilities, instructional programs and text books, and transportation systems.[5] While portions of the regulation describe some programs and facilities which no doubt are relevant to the question of "thoroughness," I believe the Court errs in stating that compliance with IDAPA 08.02 is now constitutionally mandated through the word "thorough" in Article 9, § 1, of the Idaho Constitution. Today's decision will raise innumerable complex factual issues, some of which will be totally unrelated to what constitutes a "thorough" education.

Today's opinion leaves unanswered such questions as whether that portion of the regulations dealing with the standards for new school construction must be applied to existing facilities as the result of the constitutionalizing of State Board of Education Regulation No. 08.02. I believe the Court has committed a serious error by first concluding that the *Thompson* case did not resolve the "thorough" requirement of Article 9, § 1, and then adopting the State Board of Education's regulations to determine the constitutional thoroughness requirement.

APPENDIX A

STATE BOARD OF EDUCATION

RULES AND REGULATIONS

FOR

PUBLIC SCHOOLS

K–12

Approved
By the Idaho State Board of Education
December, 1982

Effective
January, 1983

---

5. While the regulations are much too voluminous to describe, much less set out in this opinion, attached as Appendix "A" is the table of contents for those regulations which indicates the vast scope of the material which today's opinion constitutionalizes.

Reprinted June, 1992
All Revisions Included to Date

## THE IDAHO STATE BOARD OF EDUCATION

M. Karl Shurtliff, President .................................................. Boise
Keith S. Hinckley, Vice-President ........................................ Blackfoot
Roy Mosman, Secretary ................................................... Moscow
Diane Bilyeu, Member.................................................... Pocatello
Roberta L. Fields, Member ......................................... New Meadows
Colleen Mahoney, Member............................................. Lewiston
Joe Parkinson, Member.................................................... Boise
Jerry L. Evans, Ex Officio Member ...................................... Boise

STATE BOARD OF EDUCATION
RULES AND REGULATIONS
FOR
PUBLIC SCHOOLS
K–12

## INDEX

CHAPTER A........................... School District Organization and Operation

CHAPTER B........................................School District Fiscal Affairs

CHAPTER C................................. District Personnel and Certification

CHAPTER D................................................. School Facilities

CHAPTER E.............................. Instructional Programs and Textbooks

CHAPTER F............................................... Special Programs

CHAPTER G.................................................. Transportation

CHAPTER H........................................... Miscellaneous Items

## APPENDIX

Employment of Public School Personnel and Equitable
Delivery of Educational Services

Uniform Policy on Teacher Placement Files

Statement by State Board of Education on Corporal Punishment

Fall Statewide Educational Conferences
STATE BOARD OF EDUCATION
RULES AND REGULATIONS FOR PUBLIC SCHOOLS
K–12

**592**

Subject–Title Chapter–Rule

–A–

Absence, Day of ......................................................... A.4
Accounting, Pupil—Definition ............................................ A.4
Accreditation, High School .............................................. E.12
Accreditation, Middle/Junior High ....................................... E.11
Accreditation, Personnel Standards ...................................... C.32
Accredited Institution, Definition ...................................... C.1
Activity Busing ......................................................... G.7
ADA, Determination ...................................................... B.2
ADA, Early Graduation ................................................... B.2
Additions, Alterations/Renovations, (Bldg) .............................. D.7
Administrative Exceptional Child Endorsement ............................ C.25
Administrator, Vocational Education, Certificates ....................... C.30
Administrator's Certificate ............................................. C.21
Advanced Counselor Endorsement .......................................... C.22
Advanced K–3 Certificate ................................................ C.18
Advanced Elementary Certificate ......................................... C.18
Advanced Secondary Certificate .......................................... C.18
Advanced Standing Examination ........................................... E.8
Agreement, Cooperative .................................................. E.8
Altering School District Boundaries ..................................... H.6
Alternate High School Programs .......................................... E.16
Alternate Route, Certification .......................................... C.18
American School ......................................................... E.7
Ancillary Personnel, Base Salary ........................................ B.4
Ancillary Personnel Funding ............................................. B.5
Appeals to State Board of Education ..................................... H.3
Appeals of Certification ................................................ C.17
Applicants from Regionally Accredited Institutions ...................... C.7
Applied Music, Limited Certificate ...................................... C.26
Architects, School District will Require to Provide ..................... D.10
Architectural Services .................................................. D.4
Attendance, Average Daily ............................................... A.4
Attendance, Day of, Grades 1–12 ......................................... A.4
Attendance, Day of, Kindergarten ........................................ A.4
Attendance, 90% ......................................................... A.5
Audiology Endorsement, Standard ......................................... C.22
Authorization, Letters of ............................................... C.9
Authorization for SDE to Approve Special Education Agencies/Con-
 tracts .............................................................. B.6
Average Daily Attendance ................................................ A.4

–B–

Bible Instruction, Limited Certificate .................................. C.26
Boards, Commissions/Advisory Councils ................................... H.2
Building Account, School District ....................................... B.8
Bus Drivers, School ..................................................... G.4

–C–

Candidate for Public Office ............................................. H.1
Capital Investment, Transportation ...................................... G.7
Certificate, Administrator's ............................................ C.21
Certificate, Application Procedures ..................................... C.17
Certificate, Applicants from Regionally Accredited Institutions ......... C.7
Certificate Changes ..................................................... C.17
Certificates, Duplicate ................................................. C.17

| Subject–Title | Chapter–Rule |
|---|---|
| Certificates, Elementary/Secondary | C.18 |
| Certificate, Endorsement of Out–of–State | C.16 |
| Certificate, Endorsement, Secondary Teachers, Subject Area | C.20 |
| Certificate, Exceptional Child | C.25 |
| Certificate, General Endorsements | C.19 |
| Certificate, Initial | C.17 |
| Certificate, Letters of Authorization | C.9 |
| Certificate, Life | C.4 |
| Certificate, Limited | C.4 |
| Certificate, No Longer Issued | C.26 |
| Certificate, Out-of-State | C.16 |
| Certificate, Proper Certification Required—Misassignment | C.10 |
| Certificate, Pupil Personnel Services, Standard and Advanced | C.22 |
| Certificate, Renewal | C.17 |
| Certificate, Retention of Transcripts Submitted for | C.5 |
| Certificate, Transcripts | C.5 |
| Certificate, Vocational Administrator | C.30 |
| Certificate, Vocational Education | C.28 |
| Certificate, Vocational Specialist | C.29 |
| Certification, Alternate Route | C.18 |
| Certification, Appeals | C.17 |
| Certification, Authorizations/Misassignments | C.10 |
| Certification of Teachers Trained in Foreign Institutions | C.2 |
| Certification Standards/Vocational Educators | C.28 |
| Certification, Interstate Compact | D.9 |
| Change Order, School Facilities | D.9 |
| Closure, Emergency | A.3 |
| Code of Ethics | C.33 |
| College, Junior, Credits | C.14 |
| Communicable Diseases | E.3 |
| Commercial Computerized Routing/Scheduling | G.8 |
| Conference, Fall Teacher | Appendix 5 |
| Consolidation Feasibility Studies | B.10 |
| Construction Requirements | D.5 |
| Consultant Specialist, Limited Certificate | C.26 |
| Consultant/Advisory Service to Public Schools | H.5 |
| Consulting Teacher Endorsement | C.25 |
| Contract Program Model | A.6 |
| Contracts | B.6 |
| Contracts, Special Educ., State Approval | B.6 |
| Contracts, Standard, Deviation from | A.2 |
| Cooperating Teachers | C.12 |
| Cooperative Agreement | H.4 |
| Core Competency | E.12 |
| Corporal Punishment | Appendix 4 |
| Correspondence, Private & Trade Schools | F.4 |
| Counselor Endorsement | C.22 |
| Courses of Study | E.2 |
| Credential Files, Policy | Appendix 2 |
| Credits, Non-resident | C.15 |
| Credits, Junior College | C.14 |
| Curriculum Materials, Charges for | E.1 |

–D–

| | |
|---|---|
| Days in Session | A.4 |
| Day of Absence | A.4 |
| Days of Attendance | A.4 |
| Days of Attendance, Kindergarten | A.4 |
| Defense, Civil | E.2 |
| Definition of an Accredited Institution | C.1 |

**594**

| Subject–Title | Chapter–Rule |
|---|---|
| Detention, Juvenile | E.17 |
| Determination for ADA, Early Graduation | B.2 |
| Development Program Model | A.6 |
| Deviation from Standard Contract Form | A.2 |
| Deviation from State Board Standards, School Facilities | D.2 |
| Diploma, High School, Rehabilitation Courses | E.4 |
| Diseases, Communicable | E.3 |
| Distance Learning | E.12 |
| District Boundaries, Altering | H.6 |
| District, Local Evaluation Policy | C.35 |
| Driver Education Instructor Qualifications | F.1 |
| Driver Education Programs | F.1 |
| Driver Education Permits | F.1 |
| Drivers, School Bus | G.4 |
| Duties of School Bus Drivers | G.4 |

–E–

| | |
|---|---|
| Early Childhood/Special Education Endorsement | C.25 |
| Early Graduation | B.2, E.12 |
| Educational Conferences, Fall | Appendix 5 |
| Educational Program, Principle | E.11 |
| Educational Services, Delivery of | Appendix 1 |
| Elections, Candidate for Public Office | H.1 |
| Elementary School Approval | E.10 |
| Elementary Certificates | C.18 |
| Elementary Music Specialist Certificate | C.18 |
| Emergency Closure | A.3 |
| Employment of Public School Personnel/Equitable Delivery of Services | Appendix 1 |
| Endorsement, Elementary School Principal | C.21 |
| Endorsement, Interim School Nurse | C.23 |
| Endorsement, Out-of-State Certificates | C.16 |
| Endorsement, Secondary School Principal | C.21 |
| Endorsement, Secondary Teachers, Subject | C.20 |
| Endorsement, School Nurse | C.24 |
| Endorsement, Subject Areas | C.20 |
| Endorsement, Superintendent | C.21 |
| Endorsement, Teaching Certificate, General | C.19 |
| Environmental Design Requirements, Facility | D.6 |
| Ethics, Code of | C.33 |
| Evaluation, Local District Policy | C.35 |
| Exceptional Child Certificate, Advanced | C.25 |
| Exceptional Child Certificate, Standard | C.25 |
| Exceptional Child Endorsement, Administrative | C.25 |

–F–

| | |
|---|---|
| Facilities, Guide for Planning School | D.1 |
| Facilities, School, Deviation | D.2 |
| Facility Environmental Design Requirements | D.6 |
| Fall Statewide Educational Conferences | Appendix 5 |
| Feasibility Studies | B.10 |
| Federally Funded Programs | A.1 |
| Fifth Year Level of College Work, Qualifications for | C.13 |
| Files, Uniform Policy on Teacher Placement | A.2 |
| Fire Drills | E.10, E.12 |
| Foreign Institutions, Certification of Teachers Trained in | C.2 |
| Funding, Ancillary Personnel | B.5 |
| Funds Withheld, Late Submission of Records | B.1 |

Subject–Title Chapter–Rule

–G–

GED Tests ....................................................................... E.5
General Reporting, School Facilities .............................................. D.8
Gifted/Talented Model ........................................................... A.6
Grades 1–12, Days of Attendance ................................................. A.4
Graduation Requirements ........................................................ E.12
Graduation, Early ............................................................... B.2
Guide for Planning School Facilities .............................................. D.1

–H–

Half-day in Session .............................................................. A.4
Head Teacher, Small Schools ..................................................... C.11
High School Diploma, Rehabilitation Courses ...................................... E.4
Home Study Courses ............................................................. E.6
Homebound Program Model ....................................................... A.6

–I–

Idaho State Penitentiary, Special Programs ........................................ F.4
Idaho Teacher Excellence Program ................................................ C.34
Initial Professional Certificate Examination ........................................ C.17
Instructional Time, Driver Education .............................................. F.1
Instructional Time, Required ..................................................... A.4
Integrated Kindergarten Model .................................................... A.6
Interim School Nurse Endorsement ............................................... C.23
Interns, Permits ................................................................. C.6
Interstate Certification Compact .................................................. C.31
Investment, Capital .............................................................. G.8
Itinerant Program Model ......................................................... A.6

–J–

Junior College Credits ........................................................... C.14
Junior High School Accreditation ................................................. E.11
Juvenile Detention ............................................................... E.17

–K–

Kindergarten ............................................................... B.3, E.10
Kindergarten, Days of Attendance ................................................ A.4
Kindergarten, Double Session Authorized .......................................... B.3

–L–

Letter of Authorization Proposal .................................................. C.9
Licensing Commercial Driver Training Schools and Instructors ..................... F.1
Life Certificates ................................................................. C.4
Limited Certificates .............................................................. C.26

–M–

Maintenance Standards .......................................................... G.2
Middle/Junior High School Accreditation .......................................... E.11
Misassignment, Authorization .................................................... C.10
Misassignment, Proper Certificate ................................................ C.10
Models, Special Education Programs ............................................... A.6

–N–

NASDTEC ................................................................................... H.7
National Standards Adopted, Transportation ..................................... G.1
Ninety Percent Attendance Requirement......................................... A.5
Non-resident Credits ...................................................................... C.15
Nurse, School ........................................................................... C.24
Nurse, Interim, School, Endorsement ........................................... C.23

–O–

Official Vehicle for Approval of Existing Teacher Education Programs............ H.7
Organization Patterns, School ........................................................ A.7
Out-of-State Certificates, Endorsements............................................ C.16
Out-of-State Tuition...................................................................... B.9

–P–

Penitentiary, Idaho State, Special Programs ..................................... F.3
Permits, Interns ......................................................................... C.6
Personnel, Accreditation Standards ................................................ C.32
Personnel, Ancillary, Base Salary ................................................... B.4
Personnel Standards for Accreditation and Approval ........................... C.32
Plans, Submission of (School Facility) ............................................. D.3
Policy (Transportation)................................................................. G.6
Professional Standards Commission, Reimbursement, Substitute Teach-
 ers ....................................................................................... B.7
Programs, Federally Funded .......................................................... A.1
Provisional Early Childhood, Limited Certificate................................ C.26
Psychological Examiner Endorsement.............................................. C.22
Public Office, Candidate for .......................................................... H.1
Pupil Accounting ........................................................................ A.4
Pupil Personnel Certificate............................................................ C.22
Pupil/Counselor Ratios ................................................................ E.10–12

–R–

Records, Late Submissions, Funds Withheld ..................................... B.1
Regional Institutions, Certificates .................................................. C.7
Rehabilitation Courses for High School Diploma ............................... E.4
Reimbursement to Districts for Substitute Costs ............................... B.7
Reimbursement to Districts for Feasibility Study for High School/Dis-
 trict Consolidation .................................................................. B.10
Release Time Programs.................................................................. E.9
Religion, Release Time ................................................................. E.9
Renewal of Certificates ................................................................ C.17
Reporting, General (Facilities Construction) .................................... D.8
Required Instructional Time........................................................... A.4
Resource Program Model .............................................................. A.6
Retention of Transcripts Submitted with Applications or Teachers Cer-
 tificates ................................................................................ C.5
Routing and Scheduling, Computerized ........................................... G.9

–S–

Safety Busing ............................................................................ G.7
Salary, Ancillary Personnel ........................................................... B.4
Scheduling and Routing, Computerized ........................................... G.9
School Bus Depreciation ............................................................... G.8, 6
School Bus Drivers ...................................................................... G.4
School Bus Inspection .................................................................. G.2, 1

| Subject–Title | Chapter–Rule |
|---|---|
| School District Boundaries, Altering | H.6 |
| School District Building Account | B.8 |
| School District Organization and Operation | A |
| School Facilities, Architectural Services | D.4 |
| School Facilities, Construction Requirements | D.5 |
| School Facilities, Deviation | D.2 |
| School Facilities, Environmental Design Requirements | D.6 |
| School Facilities, Planning | D.1 |
| School Facilities, Submission of Plans | D.3 |
| School Nurse | C.24 |
| School Organization Patterns | A.7 |
| School Psychologist Endorsement | C.22 |
| School Schedules | A.4 |
| School Week, Definition | A.4 |
| Schools, American | E.7 |
| Secondary Certificates | C.18 |
| Secondary Field Centered Teacher Training Program | C.18 |
| Self–Contained Program Model | A.6 |
| Services, Withholding | A.3 |
| Small Schools, Head Teacher | C.11 |
| Social Worker Endorsement, School | C.22 |
| Special Design Model | A.6 |
| Special Education Agencies and Contracts Authorization for SDE Approval | E.6 |
| Special Education Contracts, Approval | B.6 |
| Special Education Program Models | A.6 |
| Special Programs, Idaho State Penitentiary | F.3 |
| Speech Language Pathologist Endorsement | C.22 |
| Standard K–3 Certificate | C.18 |
| Standard Elementary Certificate | C.18 |
| Standard Secondary Certificate | C.18 |
| Standard Counselor Endorsement | C.22 |
| Standards Adopted, National (Transportation) | G.1 |
| State Department of Education Approval | E.6 |
| State Support Program Allowance | B.9 |
| Statement by State Board of Education on Corporal Punishment | Appendix 4 |
| Strike, Teacher | A.3 |
| Student Busing, Duties and Responsibilities | G.5 |
| Study, Courses of | E.2 |
| Submission of Plans, School Facilities | D.3 |
| Substitute Teacher Authorization | C.8 |
| Substitute Teacher, Reimbursement | B.7 |

–T–

| | |
|---|---|
| Teacher Conferences | Appendix 5 |
| Teacher Education Programs, Approval | H.7 |
| Teacher Excellence in Idaho | C.34 |
| Teacher, Head, Smaller Schools | C.11 |
| Teacher, Idaho, Excellence Program | C.34 |
| Teacher Inservice Activities | A.4 |
| Teacher–Parent Conferences | A.4 |
| Teacher Placement Files, Uniform Policy | Appendix 2 |
| Teacher Strike | A.3 |
| Teachers, Cooperating | C.12 |
| Teachers, Homebound | B.5 |
| Teachers, Substitute | C.8 |
| Teaching Certificate, Application Procedures | C.17 |
| Testing in the Public Schools | E.13 |
| Tests, General Educational Development (GED) | E.5 |
| Textbook Adoptions | E.14 |
| Textbook and Improvement of Instruction Committee | E.14 |

**598**

| Subject–Title | Chapter–Rule |
|---|---|
| Trade Schools, Private Correspondence | F.4 |
| Transcripts Submitted with Certification Applications, Retention of | C.5 |
| Transitional, Limited Certificate | C.26 |
| Transportation, Activity Busing | G.7 |
| Transportation, Capital Investment | G.8 |
| Transportation, Commercial Computerized Routing | G.9 |
| Transportation, Field Trip Busing | G.7 |
| Transportation, Maintenance Standards | G.2 |
| Transportation, National Standards Adopted | G.1 |
| Transportation, Policy | G.6 |
| Transportation, Program | G.6 |
| Transportation, Program Costs | G.7 |
| Transportation, Safety Busing | G.7 |
| Transportation, School Bus Drivers | G.4 |
| Transportation, Student Duties and Responsibilities | G.5 |
| Transportation, Vehicle Operation | G.3 |
| Tuition, Out-of-state | B.9 |

–U–

| | |
|---|---|
| Uniform Policy on Teacher Placement Files | Appendix 2 |
| Use of Life Certificates | C.4 |

–V–

| | |
|---|---|
| Vehicle Operation | G.3 |
| Vehicles, Driver Education | F.1 |
| Veterans Education Program, Approval of Schools | F.2 |
| Vocational Education, Administrator Certificate | C.30 |
| Vocational Education, Specialist Certificate | C.29 |
| Vocational Education Certificates | C.28 |
| Vocational Endorsement | C.28 |

–W–

| | |
|---|---|
| Withheld, Funds—Late Submission of Records | B.1 |
| Withholding of Service | A.3 |