450

129 P.3d 1199

IDAHO SCHOOLS FOR EQUAL EDU-CATIONAL OPPORTUNITY; Moscow School District # 281; Lapwai School District 341; Mullan School District # 392; Potlatch School District # 285; Kendrick Joint School District # 283; Cascade School District # 422; St. Maries Joint School District # 41; Orofino Joint School District # 171; Culdesac Joint School District # 342; Genesee Joint School District # 282; Highland–Craigmont Joint School District # 305; Rockland School District # 382; Horseshoe Bend School District # 73; Richfield School District # 316; Boundary County District # 101; Kamiah Joint District # 204; Nez Perce District # 302; Cottonwood District # 242; Midvale School District # 433; Post Falls School District # 272; And Bonner County School District # 82, Plaintiffs–Counterdefendants–Respondents,

and

Brian Silflow and Ganel Silflow, by and through their parents, Dale and Patti Silflow, husband and wife; Donald Paul Crea by and through his father, Gary Crea; Andy Cook, by and through his father, Larry Prally; Tavia Gilbert, by and through her parents; Terry and Carolyn Gilbert; Gregory Lamm, by and through his mother, Kathy Lamm; Sara Kae Gomez, by and through her parents, Kathleen and Jose Gomez; Dietrich Stella and Jennifer Stella, by and through their parents, Charles and Rebecca Stella; Gregory Daniels, by and through his mother, Nancy Daniels; Gina M. Decker, by and through her parents, Gene and Linda Decker; Jennifer A. Alder, by and through her parents, Max and Judy Alder; Angela F. Gerrard, by and through her parents, Roger and Rhoda Gerrard; Catherine A. Sporleder, by and through her mother; Joanne Sporleder; Morgan Rounds and Seth Rounds, by and through their parents, Ivan Rounds and Brenda Rounds; Kelli Longeteig, by and through her parents, Willfred Longeteig and Beverly Longeteig; Don Hoffer, by and through his mother, Kit Hoffer; Sarah Malloy, by and through her mother, Susie Malloy; Kory Turnbow, by and through his mother, Donagene Turnbow; Shawna Olsen, Shannon Olsen and Ryan Olsen, by and through their mother, Teresa Olsen; Krista Anne Goetz, by and through her father, Allan J. Goetz; Chad Knee, by and through his parents, kelly and karen knee; on behalf of themselves and all other school people of the State of Idaho similarly situated, Plaintiffs–Respondents,

v.

The STATE of Idaho, Defendant–Counterclaimant–Appellant.

No. 29616.

Supreme Court of Idaho,
Boise, September 2005 Term.

Dec. 21, 2005.

See also, 140 Idaho 586, 97 P.3d 453.

Hon. Lawrence G. Wasden, Attorney General, Boise, for appellant. James D. Carlson argued.

Huntley Park, LLP, Boise, for respondents. Robert C. Huntley Jr. argued.

TROUT, Justice.

This is an appeal of a district court decision granting declaratory judgment against the State of Idaho in an action challenging the adequacy and method of funding public education in Idaho. After conducting a trial in 2000, the district court issued Findings of Fact and Conclusions of Law in early 2001 in which it determined the State has failed in its constitutional duty to provide a thorough education for Idaho's public school students in a safe environment conducive to learning, especially as it pertains to the poorest of school districts. The State appeals the judgment, as well as further district court orders addressing remedial measures.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This is the fifth time this case has been brought on appeal to this Court since the filing of the initial complaint in June 1990. The Respondents are the Idaho Schools for Equal Educational Opportunity, an unincorporated association of school district superintendents of several Idaho public school districts, various school districts and several parents of school children attending public schools in Idaho (collectively referred to as ISEEO), and the Appellant is the State of Idaho (State). In the district court, ISEEO sought a declaratory judgment that "the present level and method of funding for Idaho's public schools [is] unconstitutional." The suit is based upon Article IX, § 1 of the Idaho Constitution, which reads as follows:

> The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the Legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools.

In the first appeal, this Court determined ISEEO had standing to sue and clarified that it is the judicial branch's constitutional duty to define the meaning of the Idaho Constitution and what constitutes a "thorough system of public, free schools." *See Idaho Schs. For Equal Educ. Opportunity v. Evans*, 123 Idaho 573, 583, 850 P.2d 724, 734 (1993) (*ISEEO I*). After *ISEEO I*, the Legislature made several changes to Idaho's public school system, such as increasing public school appropriations and directing the State Board of Education (SBE) to develop new rules. In the second appeal, this Court determined the legislative changes did not make the lawsuit moot. *See Idaho Schs. For Equal Educ. Opportunity ex. rel. Eikum v. State Bd. of Educ. ex. rel. Mossman*, 128 Idaho 276, 912 P.2d 644 (1996) (*ISEEO II*). The case was remanded for the district court to address the issue of whether the funding system met the Legislature's obligation under the Idaho Constitution to provide a "thorough system" of public education. *Id.* The case came back to this Court and in *ISEEO III*, this Court concluded the new rules drafted by SBE relating specifically to facilities met the constitutional requirement of thoroughness. *See Idaho Schs. For Equal Educ. Opportunity v. State*, 132 Idaho 559, 976 P.2d 913 (1998) (*ISEEO III*). We noted, "a safe environment conducive to learning is inherently part of a thorough system of public, free common schools...." *ISEEO III*, 132 Idaho at 566, 976 P.2d at 920. On remand, the district court was directed to determine the narrow issue of whether the Legislature had provided a means to fund facilities that provide a safe environment conducive to learning, pur-

suant to the thoroughness requirement of Article IX, § 1.

The district court held a court trial in 2000, and in 2001 entered its Findings of Fact and Conclusions of Law (2001 Findings). The district court concluded the system of school funding established by the Legislature was insufficient to meet the constitutional requirement because reliance on loans alone to pay for major repairs or the replacement of unsafe school buildings was inadequate for the poorer school districts. The district court deferred any remedial action to allow the Legislature time to address the court's findings. However, in late 2002 when the Legislature, in the district court's opinion, had failed to take appropriate action, the district court began implementing its remedial measures, including a phase of information gathering and the appointment of a Special Master.

In 2003, the Legislature passed HB 403, which imposed various restrictions on lawsuits related to school funding. In *ISEEO IV*, this Court affirmed the district court's determination that HB 403 was unconstitutional. *See Idaho Schs. For Equal Educ. Opportunity v. State,* 140 Idaho 586, 97 P.3d 453 (2004) (*ISEEO IV*). All other issues having been resolved, this appeal finally addresses the district court's 2001 Findings and the court's final determination that the current state "system based upon loans alone is not adequate to meet the constitutional mandate to establish and maintain a general, uniform, and thorough system of public, free common schools in a 'safe environment conducive to learning' for Idaho's poorest school districts." We agree with this conclusion.

## II.

## ANALYSIS

■ We note at the outset that in complex litigation such as this, it is to be expected myriad issues will be raised on appeal. Several of the issues raised will not be analyzed here, however, as they concern the remedial phase of the litigation and are raised in another appeal pending before this Court. Thus, the State's arguments relating to the appointment of a Special Master, the pay-ment of the Special Master, and whether the Special Master may appoint as assistants individuals who had previously been involved as witnesses for ISEEO will not be considered until those issues are properly before this Court in the suspended appeal of *Fourth District Court v. Bail.*

### A. ISEEO and its representative capacity

■ The first question we will consider is broadly stated as whether ISEEO may litigate and obtain a judgment on behalf of school districts that are not a party to this lawsuit. This Court has repeatedly held ISEEO has standing to seek a declaration that the Legislature has failed to carry out its constitutional responsibility to provide a thorough system of public education. *See ISEEO I; ISEEO IV.* Organizational standing clearly confers on ISEEO the ability to represent its members, but because the declaration ISEEO seeks applies to all school districts throughout the state, ISEEO cannot be limited to presenting evidence concerning only the named districts. The underlying issue in this case is whether the Legislature has provided the proper level and method of funding school facilities to create a safe environment conducive to learning, not whether particular districts need additional funds for facility improvements. Accordingly, ISEEO must be allowed to present statewide evidence of facility problems, including safety concerns of districts which have settled or were never parties to this lawsuit. Similarly, it is appropriate for the district court's judgment to be entered on behalf of those ISEEO members who presented no evidence at trial. ISEEO is not constrained to provide evidence relating only to party districts, nor must ISEEO provide evidence concerning every party district. Again, the focus of this litigation is on the adequacy of the Legislature's mechanism for funding public school districts; a judgment that such a funding mechanism is unconstitutional will necessarily affect all school districts throughout the state, regardless of whether those districts presented evidence at trial, previously settled, or were never even parties to this lawsuit. ISEEO, though not technically representing certain school districts, is entitled to

show statewide safety problems caused by the Legislature's current methods and levels of funding.

## B. Thoroughness

Next, we briefly turn to the issues of whether the definition of "thorough" as used in our constitution is a question of law or fact, and whether state standards relating to educational coursework and programs were sufficient to provide for a thorough education. In its 2001 Findings, the district court responded to the State's allegations that the school districts were misusing their funds for superfluous programs instead of addressing building safety issues by concluding it was necessary to go beyond the current state educational standards in order for the districts to provide a thorough education. The State charges the district court erroneously converted the issue of defining what is thorough into a question of fact in determining the state standards were insufficient. As this Court stated in *ISEEO I*, it is our constitutional duty to define the meaning of the thoroughness requirement of Art. 9 § 1, and so the definition of thorough is clearly a question of law. *See ISEEO I*, 123 Idaho at 583, 850 P.2d at 734. We again emphasize the current issues before the Court today relate solely to whether the Legislature has failed to provide an adequate means of funding school facilities. To the extent the district court addressed the adequacy of state standards relating to course work and programming, such a discussion is irrelevant to the issues presented on this appeal. Thus, we decline to analyze thoroughness as it relates to course work and programming.

## C. Adequacy of evidence

 The next issue raised by the State relates to the adequacy of the facts the district court relied on in its 2001 Findings. The standard for the adequacy of factual findings, over which appellate courts exercise free review, is whether they are explicit enough to give appellate courts a clear understanding of the basis of the district court's decision. *In re Leavitt*, 171 F.3d 1219, 1223 (9th Cir.1999). The district court's 2001 Findings addressed, among other things, the

many safety concerns of specific school districts, such as structural problems and fire hazards. The district court also made several generalized factual findings, such as "Idaho's schools, particularly those in rural areas, are stretched to the breaking point in meeting the educational needs of their charges." The State takes issue with these more generalized findings, arguing the district court's mandate from this Court in *ISEEO III* required specific facts to determine if particular facilities in specific school districts provided a safe environment conducive to learning. In making this argument, the State attempts to refocus this litigation into small, district-by-district battles instead of addressing the larger, overall issue of the Legislature's constitutional duty towards public education in Idaho. The State has mischaracterized this Court's order on remand, which was to determine whether the Legislature has provided a means to fund facilities that provide a safe environment conducive to learning, not whether each Plaintiff school district's facilities were adequate to provide a safe environment. In short, the State fails to grasp the relevance of the adage "the whole is greater than the sum of its parts." Since the issue is systemic in nature and the admitted evidence so voluminous, the district court did not commit any error in making some generalized findings about facility problems, after pointing out some specific and illustrative examples.

 The State also alleges several of the 2001 Findings were not supported in the record by substantial and competent evidence. A district court's findings of fact will not be set aside unless they are clearly erroneous. *Wood v. City of Lewiston*, 138 Idaho 218, 61 P.3d 575 (2002). If the findings are supported by substantial and competent, though conflicting, evidence, they will not be disturbed by this Court. *Id.* The district court need not resolve every factual dispute between the parties; rather, the district court need only address those factual issues material to the resolution of the claims. *See Quiring v. Quiring*, 130 Idaho 560, 944 P.2d 695 (1997).

 While the State quibbles with some of the evidence used to support the 2001 Find-

ings, the State has failed to show how the disputed findings were material to the overall conclusion the Legislature has failed in its constitutional duty to provide a thorough public education system. The record in this case involves a transcript of more than 3,500 pages, thousands of pages of pre-filed testimony and thousands of pages of exhibits. The record also includes uncontradicted testimony from numerous school administrators and superintendents outlining facility problems and the barriers to correcting them. The State's pedantic focus on such details as whether it would cost $7 million to build a new school as opposed to the district court's finding of $10 million distracts from the overwhelming evidence in the record documenting serious facility and funding problems in the state's public education system. Among such evidence is the State of Idaho's own 1993 Statewide School Facilities Needs Assessment, which documented facility deficiencies and concluded 57% of all Idaho school buildings had "serious" safety concerns. A 1999 update to that report noted 53 of the buildings needing serious and immediate attention in 1993 had deteriorated even further.

In addition, the district court found that a 1999 inspection of the Wendell middle school, built in 1915, revealed crumbling concrete, which led to the condemnation of the school. The abandonment of the school resulted in "double shifting" with the high school, meaning middle school students attended the high school part of the week while the high school students attended the rest of the week and on Saturdays. Another example illustrating both the safety concerns and the difficulties of funding remedies is the American Falls High School. In 1997, a seismic analysis concluded the high school would likely collapse should a "probable seismic event" occur. Repairs were made in 2000 to lessen the danger, but the American Falls School District decided it needed a new high school. It took three unsuccessful attempts before the district was finally able to gain voter approval of a bond to construct a new high school with a scheduled completion date of 2002. In its 2001 Findings, the district court somberly observed, "It will be five years from the time that the danger was discover-

ed until a new structure is built. It took three years to take measures to lessen the danger to the students." Similarly, it took over five years from the date of an initial safety inspection report that the Troy Junior Senior High School was unsafe for occupancy to complete a more intensive review, which also recommended the building no longer be used. A superintendent testified that the surrounding community had supported the district to the best of its ability but could not afford any more levies. As of 2001, the building was still in use.

The district court explored the funding problems in great detail, and concluded the "glaring gap" in the funding system was the "lack of any mechanism to deal quickly with major, costly, potentially catastrophic conditions by districts which are low in population, have a low tax base and are in economically depressed areas." The district court proceeded to identify the difficulty of passing bonds in various school districts, including St. Maries, in which a "much pared down bond request" finally passed in 1987, after repeated bond levies from 1980–1986 failed to garner the required supermajority vote. The district court noted another scenario illustrating the difficulties associated with the supermajority vote requirements in bond elections:

> In Jerome School District #261, there have been major problems in using bonds. In 1996, a $12.6 million bond lost with a 64.5% vote in favor. In 1997, a $13.9 million bond levy lost with a 66.3% vote in favor. In 1998, a $13.9 million bond lost with a 62.5% "yes" vote.... A small supplemental levy passed. The district lost a $10.9 million dollar bond vote for a new middle school with a 59% approval. They do need a new school to provide a thorough education.

One superintendent testified the Cottonwood School District "had to pass an override levy just to buy paper and books, pay the utility bills and keep the doors open."

█ The list of safety concerns and difficulties in getting funds for repairs or replacements is distressingly long; the overwhelming evidence not only supports, but

compels the district court's conclusion of law: the funding system in effect in 2001 was simply inadequate to meet the constitutional mandate to provide a thorough system of education in a safe environment. Thus, to the extent there are any inaccuracies in the 2001 Findings, they are very minor and not clearly erroneous in light of the extensive evidence in the record supporting the district court's conclusion.

## D. Effect of subsequent events

■ The next issue raised by the State concerns mootness. Generally, appellate review of an issue will be precluded where an issue is deemed moot. An issue is moot "if it does not present a real and substantial controversy that is capable of being concluded through judicial decree of specific relief." *State v. Rogers,* 140 Idaho 223, 226, 91 P.3d 1127, 1130 (2004) (citing *ISEEO II,* 128 Idaho at 281–282, 912 P.2d at 649). Thus, an issue is moot "if a favorable judicial decision would not result in any relief or the party lacks a legally cognizable interest in the outcome." *Rogers,* 140 Idaho at 227, 91 P.3d at 1131 (citations omitted).

■ In its briefing, the State contends a number of events have taken place since 2000 that render many of the district court's findings moot and are significant enough to warrant reversal of the court's conclusion that the Legislature has failed to provide for a thorough public education system with respect to school facilities. For example, legislation passed in 2000 and amended in 2001 created interest grants for plant facilities levies to abate unsafe school facilities, several school districts have since passed plant facility levies or taken measures to address unsafe facility conditions, and other conditions have changed in the various school districts that presented evidence in 2000. These events, argues the State, make many of the district court's 2001 Findings clearly erroneous or no longer applicable. Interestingly, at oral argument, the State argued that any ruling by the district court was actually premature, rather than moot, because of the legislative changes and urged this Court to remand the case back to the district court for further action.

We pause to note the significant strides the Legislature has made in providing additional funds to Idaho schools for building replacement and repair. The Legislature amended the School Safety and Health Revolving Loan Fund, created in 2000, to a Loan and *Grant* Fund in 2001. *See* I.C. 33–1017(7)–(12). That fund provided $10 million to seven school districts enabling them to finance some facility repair or replacement. Indeed, several of those districts were addressed in the district court's 2001 Findings. The Legislature took another major step forward by enacting the Idaho Uniform Public School Building Safety Act, I.C. 39–8001 *et seq.,* which allows for the creation of uniform safety standards and requirements for the inspection of the structural integrity of Idaho's existing school buildings. Also, the Legislature has increased the time to pay for a plant facilities levy from ten to twenty years, reducing the annual payments and possibly making such levies a more attractive option for voters. *See* I.C. 33–804A. The Legislature is to be commended for taking these steps towards providing a safe environment conducive to learning.

Such legislation does not, however, make this case moot. We acknowledge several school districts have been able to remedy their safety issues, but such progress is not attributable solely to the newly enacted legislation. For example, Garden Valley received a three-fold increase in receipt of federal forest funds. In some cases, unsafe conditions were remedied because the districts were finally able to pass their own large levies, albeit with some state assistance. The Minidoka District, for instance, passed a $10 million plant facilities levy and received a $578,095 interest grant from the State. As for the Loan and Grant Fund, when the program that led to the $10 million disbursal expired, it was replaced by a bond interest subsidies program for which the 2004 appropriation was $2 million. Unfortunately, there is no indication in the record that there is any commitment to continued funding of the Loan and Grant Fund, or that the amount appropriated was sufficient to carry out the Legislature's constitutional responsibilities. Indeed, there is little to show that the pres-

ent system of funding is adequate to stop the further accumulation of dangerous or inadequate buildings.

But even assuming this case could technically be deemed moot based on subsequent legislation and remedial measures taken by several school districts, it clearly falls within the public interest exception to the mootness doctrine. Under this exception, an otherwise moot issue may be heard if it is one of substantial public interest. *Johnson v. Bonner County Sch. Dist. No. 82,* 126 Idaho 490, 492, 887 P.2d 35, 37 (1994). Clearly, as this Court stated in *ISEEO II,* "The 'thoroughness' of the system of public education affects the present and future quality of life of Idaho's citizens and its future leaders, its children." *ISEEO II,* 128 Idaho at 284, 912 P.2d at 652. Thus, this Court may address the issue of whether the State has met its constitutional mandate to provide a safe environment conducive to learning, as it is certainly a matter of great public importance.

### E. Post-trial affidavits

Another concern raised by the State is whether the district court erred in considering ISEEO's post-trial affidavits. The State, in its Proposed Findings of Fact, made reference to several school districts' financial data in exhibits to support its claim that many districts had substantial resources that could have been put toward facility repairs. In response, ISEEO moved to file twelve affidavits of witnesses who had earlier testified at trial. The State argues the admission of these affidavits was in error because it was denied the right to cross-examine these witnesses who filed affidavits after trial.

An appellate court reviews a district court's decision admitting or excluding evidence under the abuse of discretion standard. *Clark v. Klein,* 137 Idaho 154, 156, 45 P.3d 810, 812 (2002) (citing *Morris By and Through Morris v. Thomson,* 130 Idaho 138, 144, 937 P.2d 1212, 1218 (1997)). This Court has adopted a three part test for determining whether the district court abused its discretion: (1) whether the court correctly perceived that the issue was one of discretion; (2) whether the court acted within the outer

boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether it reached its decision by an exercise of reason. *Sun Valley Shopping Center Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991). In the case of an incorrect ruling regarding evidence, a new trial is merited only if the error affects a substantial right of one of the parties. *Clark,* 137 Idaho at 156, 45 P.3d at 812 (citing *Morris,* 130 Idaho at 144, 937 P.2d at 1218).

The district court's decision regarding admissibility of evidence was a matter of discretion. Under these facts, it cannot be said the district court acted outside the boundaries of its discretion or failed to exercise reason in considering post-trial affidavits as rebuttal testimony. Both parties to this litigation agreed to pre-file much of their proposed direct evidence testimony. Therefore, much of the testimony in the record was not subject to cross-examination. Also, the State could have simply filed its own affidavits countering those brought forward by ISEEO, but the State failed to do so. There was no error in the district court considering these affidavits, since all came from witnesses who had already testified at the trial. The State had the opportunity to question these same witnesses about the school districts' financial data previous to or during trial, or the State could simply have filed its own post-trial affidavits.

### F. Silver Valley testing

The State next charges the district court erred in ordering the State to pay ISEEO's attorney for the Silver Valley lead testing expenses. The issue arose when the district court, after hearing testimony on the potentially dangerous levels of heavy metal contamination in the Silver Valley, ordered lead testing of the local schools. The district court was led to believe funds were available from the federal Environmental Protection Agency or various state agencies to cover the testing costs. ISEEO later notified the district court that such funds were not forthcoming, but ISEEO counsel would personally fund expert testing and seek reimbursement. After the testing was completed, the district

court, without citing a statute or rule, ordered the State to reimburse ISEEO's attorney for the testing expenses. The order simply stated, "[T]he plaintiffs are awarded their costs incurred to date on testing in relation to the Silver Valley Schools."

We conclude the district court erred in awarding ISEEO costs incurred in the lead testing against the State. The district court provided no analysis or authority for its award of this specific cost against the State. The cost was awarded before any final or partial judgment was awarded in this matter, so ISEEO cannot receive reimbursement for this cost under Rule 54(d)(1)(A)(B) as a prevailing party. Also, this award is not supported under Rule 54(d)(1)(D) as a discretionary cost. The district court never made any findings, as required under the rule, justifying why this cost should be allowed. *See Hayden Lake Fire Protection Dist. v. Alcorn*, 141 Idaho 388, 111 P.3d 73 (2005) (district court must make finding for each discretionary cost granted or denied). ISEEO's counsel voluntarily undertook to fund the testing himself instead of simply informing the district court that there were no federal or state funds available to carry out the court's order and allowing the court to take further action. The court never made any specific findings regarding the Silver Valley, making this cost now appear like a discovery expense ISEEO incurred in this litigation. Because we find no statute or rule authorizing this award, we vacate the district court's award of expenditures for lead testing against the State.[1]

### G. Other issues raised on appeal

The State also raises arguments addressing reports prepared by experts at the behest of various school districts and presented to the district court during the remedy phase of the proceedings below. Any issues relating to the second, or "remedy," phase of the litigation are not part of this appeal. For the reasons that follow, we believe it more appropriate at this point for the case to remain before this Court. Thus, any remedy phase before the trial court is unnecessary and, likewise, we need not address, in this appeal, any issues which arose during that part of the litigation below.

### III.

### CONCLUSION

In sum, the evidence in the record clearly supports the district court's 2001 Findings. We affirm the conclusion of the district court that the current funding system is simply not sufficient to carry out the Legislature's duty under the constitution.[2] While the Legislature has made laudable efforts to address the safety concerns of various school districts, the task is not yet complete. The appropriate remedy, however, must be fashioned by the Legislature and not this Court. Quite simply, Article IX of our constitution means what it says: "[I]t shall be the duty of the Legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools." Thus, it is the duty of the State, and not this Court or the local school districts, to meet this constitutional mandate.

We are mindful of our duty to determine whether the current funding system passes constitutional muster, and we likewise respect the duties of the Legislature, as a separate branch of government, to make policy and funding decisions. It is not our intent to substitute our judgment on how to establish criteria for safe buildings or create a proper funding system for that of the Legislature. We agree with the Arizona Supreme Court when it stated, "[T]here are doubtless many ways to create a school financing system that complies with the constitution. As the representatives of the people, it is up to

---

1. We note the lead testing may very well have been unnecessary for the purposes of this litigation. The question of heavy metal contamination in the Silver Valley is a federal EPA concern, as much of the Silver Valley and the surrounding area are already designated as a Superfund site.

2. The Ohio Supreme Court stated it well when it said, "The valuation of local property has no connection whatsoever to the actual education needs of the locality, with the result that a system overreliant on local property taxes is by its very nature an arbitrary system that can never be totally thorough." *DeRolph v. State*, 89 Ohio St.3d 1, 728 N.E.2d 993, 999 (2000).

the legislature to choose the methods and combinations of methods from among the many that are available." *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop,* 179 Ariz. 233, 877 P.2d 806, 816 (1994). Nevertheless, we observe that legislatures of other states grappling with this same issue have come up with a number of alternatives to assist school districts in providing a safe environment conducive to learning. These alternatives simply demonstrate that there are options available to assist school districts, and are no way intended as this Court's direction to the Legislature on its further responsibilities. Reducing the majority necessary to pass a bond; allowing taxpayers to designate a portion of their income tax refund to cover repairs of school facilities (*see* Haw.Rev.Stat. § 235–102.5); funding school facilities out of the state general fund (*see, e.g.,* Educational Facilities Construction and Financing Act, 2000 N.J. Laws, c.72 (July 18, 2000) (codified at N.J. Stat. Ann. §§ 18A:7G–1 to 18A:7G–44)); authorizing a study to determine the actual cost of providing a thorough education (*see* Kan. Stat. Ann. § 46–1225); establishing a school facilities fund supported by a percentage of corporate income tax revenue (*see* N.C. Gen.Stat. § 115C–546.1, 2(b)); or creating an emergency school building repair program to fund school districts' urgent repair needs, are only a few of the possibilities. Of course, we do not, and cannot, today pass on the constitutionality of any or all of these options as they may apply to school funding in Idaho, as that question has not yet been presented to us. By listing these alternatives, we are in no way usurping the Legislature's role; we leave the policy decisions to that separate branch of government, subject to our continuing responsibility to ensure Idaho's constitutional provisions are satisfied.

In adopting Article IX, the citizens of Idaho placed their trust in the collective wisdom, creativity, and expertise of our legislators, and we do the same. We are firmly convinced the Legislature will carry out its constitutional duties in good faith and in a timely manner. At this juncture, we will not remand the case to the district court, but will retain jurisdiction to consider future legislative efforts to comply with the constitutional mandate to provide a safe environment conducive to learning so that we may exercise our constitutional role in interpreting the constitution and assuring that its provisions are met. We affirm the district court's conclusion that the current method of funding as it relates to school facilities is unconstitutional and we award costs on appeal to the Respondents.

Justice BURDICK and Justices Pro Tem KIDWELL and HURLBUTT concur.

Justice JONES Concurring in part and Dissenting in part.

The Court has done a conscientious job of addressing the remaining issues involved in this marathon case, especially because it has had to deal with a voluminous but not particularly helpful record. I concur with the Court's analysis in Section I and in Parts A, E, F, and G of Section II. With regard to Part B of Section II, I agree with the Court for the most part but believe there is a factual component, missing here, in determining what a "safe environment conducive to learning" is. With regard to Part D of Section II, I agree with the Court that the legislation passed in 2000 and afterwards does not necessarily moot the case but I do not believe the district court adequately considered the effect of such legislation. I disagree with the Court's conclusion in Part C of Section II as well as its ultimate conclusion in Section III.

I am not critical of the Court for reaching its ultimate conclusion of this long-running case. Nor do I mean to be critical of the district judge. As I see it, the parties have simply failed to carry out their responsibility to submit the kind of evidence necessary in order for either the district court or this Court to have made an informed decision. The 1993 Statewide School Facilities Needs Assessment was a good start in this proceeding, but the information contained therein is obviously stale, likely outdated, and did not address at all the issue of what type of safe facility would be conducive to learning. The Plaintiffs, on the one hand, failed to present competent evidence to establish system-wide failure. On the other hand, the State failed to present competent evidence

that the deficiencies disclosed in the 1993 Assessment had been remedied and that funding mechanisms provided by the Legislature were adequate to meet the constitutional requirements. Neither side put on witnesses competent to establish what kind of environment was necessary in order to provide a safe atmosphere that was conducive to learning.

I decline to affirm the district court's factual findings on three basic grounds. First, the district court failed to define the components of a "safe environment conducive to learning." Second, the district court's ruling is based upon insubstantial and inadequate evidence. Third, the district court failed to consider the effect of the laws enacted in 2000.

## I.

### A. The District Court Failed to Define the Components of a "Safe Environment Conducive to Learning".

It is elemental that one must know what the standard is before one can determine whether or not it has been met. The principal flaw with the district court's ruling is the lack of clear standards for determining whether the objectives set forth in *ISEEO I* and *ISEEO III* have been met. These decisions provided the following analytical framework to guide the inquiry: (1) whether the Legislature has provided the means to fund facilities that provide a safe environment that is conducive to learning, *ISEEO III*, 132 Idaho at 566, 976 P.2d at 921, which depends on (2) whether school districts can meet the standards established by the Board of Education with the money made available under the funding system. *ISEEO I*, 123 Idaho at 584, 850 P.2d at 735. The problem is that the district court did not put any flesh on the bones of the "safe environment conducive to learning" nomenclature.

Before any court can determine whether the Legislature has fulfilled its obligation to provide adequate funding sources to achieve the objectives, it is necessary to identify what attributes a facility must have in order to provide a safe environment conducive to learning. The Legislature and State Board

of Education have defined a safe environment conducive to learning, insofar as the phrase concerns facilities, as one that meets applicable building and safety codes, made applicable to the schools for the first time in 2000. Nevertheless, "safe environment conducive to learning" derives from the thoroughness requirement in the Idaho Constitution. Whether school districts are providing schools that are safe and which provide an environment that is conducive to learning is primarily a question of constitutional interpretation for this Court to answer. *ISEEO I*, 123 Idaho at 583, 850 P.2d at 734; *Osmunson v. State*, 135 Idaho 292, 294, 17 P.3d 236, 238 (2000). However, this Court is not an expert with regard to the question of what environmental conditions must exist in order for children to learn. The Court has set the objective—a safe environment conducive to learning—and has set the analytical framework, but has left it up to the parties to provide the evidence, which necessarily includes evidence from expert sources as to what components are necessary in order to achieve the objective. At a minimum, one would have expected the parties to have presented expert evidence as to what components were necessary to achieve a safe environment for students that was conducive to learning, whether or not such an environment existed throughout the educational system, and whether existing funding systems, including those enacted in 2000, were sufficient to remedy any deficiencies. It does not appear to me that evidence exists in the record to answer these questions and, therefore, it is difficult to support the district court's ruling.

The State's response to *ISEEO III* has been to focus on the physical safety of school facilities. Idaho Code § 33–1613 provides the Legislature's definition of "safe environment conducive to learning":

[t]he aspects of a safe environment conducive to learning as provided by section 33–1612, Idaho Code, that pertain to the physical plant used to provide a general, uniform and thorough system of public, free common schools are hereby defined as those necessary to comply with the safety

and health requirements set forth in this section.

I.C. § 33–1613(1). To that end, § 33–1613 requires every board of trustees to require an annual inspection of the facilities

to determine whether those school facilities comply with codes addressing safety and health standards for facilities, including electrical, plumbing, mechanical, elevator, fire safety, boiler safety, life safety, structural, snow loading, and sanitary codes, adopted by or pursuant to the Idaho uniform school building safety act, chapter 80, title 39, Idaho Code, adopted by the state fire marshal, adopted by generally applicable local ordinances or adopted by rule of the state board of education and applicable to school facilities.

*Id.* at (2). Upon receiving the report, the board of trustees "shall require that unsafe or unhealthy conditions be abated and shall instruct the school district's or other entity's personnel to take necessary steps to abate unsafe or unhealthy conditions." *Id.* at (3).

The Uniform Public School Building Safety Act applied to all facilities, existing and to-be-built, I.C. § 39–8003, and created a safety code committee, I.C. § 39–8005, which was charged with developing a safety code. I.C. § 39–8006. Until the safety code committee adopted a code, the national building codes identified in I.C. § 39–4109 were to serve as the code. The Division of Building Safety promulgated the Uniform School Building Safety Code, Idaho Admin. Code sec. 07.06.01, which adopted twelve building codes, including the Idaho General Safety and Health Standards.

The safety codes are comprehensive enough to ensure that the building standards the Legislature and school districts must achieve will provide a safe environment. The

Codes touch on nearly every aspect of building safety[3] and are widely accepted by municipalities and states throughout the Union. Moreover, existing buildings will not be ignored; indeed, the Legislature provided that the safety codes apply to "all facilities, existing now or constructed in the future...." I.C. § 39–8003.[4] So the Legislature has provided a comprehensive set of standards with which existing and to-be-built facility must comply. This certainly seems sufficient to ensure that Idaho's schools are safe.

Safety and health, however, are as far as the codes go. Simply requiring facilities to meet code does not seem sufficient under this Court's holdings in *ISEEO I* and *ISEEO III*. If the only mandate were "safe," meeting code might be sufficient; however, in the phrase, "safe environment conducive to learning," "conducive to learning" is a subordinate clause expressing the desired result of the safe facility—that it is "conducive to learning." Thus, the Court's language implies that facilities must be both safe and conducive to learning. Buildings that are safe but disruptively uncomfortable or outdated will not pass constitutional muster under the "thoroughness" standard, which is the word from which "safe environment conducive to learning" derived. Indeed, as an adjective, "thorough" means "carried through to completion"; "marked by full detail"; and "complete in all respects." MERRIAM-WEBSTER ONLINE (available at http://www.m-w.com). That a facility is safe does not necessarily mean it is conducive to learning.

The proceedings below have only focused on building safety, omitting the conducive to learning element. No record has been developed to establish what a safe environment conducive to learning is. Obviously, safety is a part, but only a part. One can't be particularly critical of the district court for failing to

---

**3.** In addition to the national uniform codes, the UPSBSC adopts the Idaho General Safety and Health Standards, produced jointly by the Industrial Commission and the Division of Public Safety. Idaho Admin. Code sec. 17.10.01.006.01.

**4.** The codes and standards adopted in the Uniform School Building Safety Code contain provisions for existing facilities but generally do not require existing facilities to meet codes applicable to new construction. *See, e.g.* Int'l Bldg.Code

§§ 101.2 (scope; applying Int'l Bldg.Code to, among other things, repair, use and occupancy, and maintenance); 101.4.5 (adopting Int'l Prop. Maint. Code, applicable to existing structures); and 102.6 (permitting occupancy of existing structures to continue without change except as otherwise provided in the Int'l Prop. Maint. Code, Int'l Fire Code, or as is deemed necessary by the building official for the general safety and welfare of the occupants and the public).

address this part of the overall objective, because it was the responsibility of the parties to present the evidence necessary to establish the components (besides safe buildings) of an environment conducive to learning. Because the parties have failed to present the evidence necessary to complete the picture, it does not seem possible to affirm the district court decision. Until we know what the components of a safe environment conducive to learning are, it is not possible to say whether the State has provided the means necessary to achieve them.

## B. The District Court's Ruling Is Based Upon Insubstantial and Inadequate Evidence.

In actions tried to the court without a jury, the court shall find the facts specially. Idaho R. Civ. P. 52(a). The court's conclusion must be based on substantial evidence. *The Highlands, Inc. v. Hosac,* 130 Idaho 67, 936 P.2d 1309 (1997). Substantial evidence is evidence that a reasonable mind might accept to support a conclusion. *Evans v. Hara's Inc.,* 123 Idaho 473, 849 P.2d 934 (1993). And as the State points out, appellate courts have free review over the adequacy of a lower court's findings. *Raad v. Alaska State Comm'n for Human Rights,* 86 P.3d 899, 904 (Alaska 2004).

The district court divided its discussion of the facts into five categories: (1) structural issues; (2) fire safety; (3) drainage, plumbing, and safe drinking water; (4) "other safety concerns"; and (5) defects in the system of school safety inspection. Within these categories, the ruling cited conditions at only of a few of the hundreds of schools in the state. Additionally, the testimony and evidence concerning these conditions is anecdotal. The court found that the "concrete aggregate provided to southeastern Idaho in the late 30's and 40's was of a lower quality and presents some ongoing concern for the structural integrity of the buildings using that concrete aggregate"; one school was plagued by "loose bricks" and "crumbling concrete"; some schools had "seismically hazardous" buildings, or leaky roofs, or "dangerous" electrical systems, or useless fire escapes, or exposed steam pipes, or inade-

quate or defective fire alarms, or breaker switches which "trip constantly"; some schools had unflushable toilets; and one school had narrow stairways that prevented emergency medical technicians from administering aid to a patient, resulting in the patient's tragic death.

The result is a decision about a statewide system based on bits-and-pieces testimony about a few of the worst schools that was current as of 2001. In order for the Court to hold that the current legislative means to provide funding for school facilities is unconstitutional, the evidence should be more substantial, more precise, and more current. Other courts which have ruled on the constitutionality of their states' school funding systems have based their rulings on something significantly more substantial than the kind of evidence in this record. *See, e.g. Montoy v. State,* 279 Kan. 817, 112 P.3d 923 (2005); *State v. Campbell County Sch. Dist.,* 19 P.3d 518 (Wyo.2001). Additionally, extrapolating the evidence in the record—which concerned only a few schools—to conclude that the Legislature is not meeting its constitutional duty statewide was erroneous. The challenge in this case is to the statewide system of funding, not simply that as applied to a few school districts, the funding system is unconstitutional. That some schools are in severe disrepair does not compel or even support a conclusion that the statewide system of funding is unconstitutional. Without reliable information about all schools, the Legislature will be unable to ensure that any adjustment to the scheme will enable all districts to provide the kind of facilities they are required to provide under the Constitution.

## C. The District Court Failed to Consider the Effect of Laws Enacted in 2000.

The third flaw with the district court's ruling is the court's failure to consider the effect of the 2000 laws relating to facilities funding. The laws were tailored to address the issues in this case and may in fact suffice. As this Court has said, changes in the statutory scheme may "alter the factual predicate of questions concerning the constitutionality of the current method of funding for public schools...." *ISEEO II,* 128 Idaho at 283, 912 P.2d at 651. But, without an analysis of

these laws and their effect on the funding picture, it is impossible to render a reasoned decision about the Legislature's means to fund facilities.

## II.

Having said that the evidence is insufficient to support the district court's findings, it is my belief that the decision based on those findings should be vacated. What then should be done to bring this matter to a conclusion? The first step would be to make a determination as to what the components of a safe environment conducive to learning are. As this litigation has demonstrated, pinpointing a clear definition is difficult to do. This litigation has also failed to produce a record on which the courts can base a well-reasoned decision. The Court is not well equipped to identify the characteristics of a school facility that is conducive to learning, and 15 years of this case shows that sending the case back to the district court for more adversarial proceedings will only prolong resolution. Therefore, the Court should enlist some technical assistance to determine what kind of safe environment is necessary to facilitate learning and to gather the facts necessary to evaluate whether the legislative means to fund such facilities are adequate.

Pursuant to its authority in Idaho R. Civ. P. 53, the Court could appoint a special master or masters to assist the Court in this task. The Court could tailor an order that sets a precise roadmap with identified tasks and deadlines. The special master(s) could be authorized to determine the components of a safe environment conducive to learning, to evaluate the available means to fund facilities that provide such an environment, and to determine whether those means are adequate to meet the objectives. The special master alternative would expedite an evaluation of the condition of Idaho's school facilities and in a relatively short amount of time the Court would be able to answer the questions presented in this case.

This avenue is not completely novel. As one example of the special master approach, the Arkansas Supreme Court has followed a similar procedure in addressing a challenge to that state's school funding scheme. In 2002, the court affirmed a trial court's ruling that the funding system was unconstitutional.

*See Lake View Sch. Dist. No. 25 v. Huckabee,* 351 Ark. 31, 91 S.W.3d 472 (2002). After two years, however, the court had apparently become dissatisfied with the legislature's responses to the case. In 2004 the court announced its intent to appoint a special master to advise the court regarding compliance with an earlier order of the court, and shortly thereafter appointed two special masters (both former justices of the Arkansas Supreme Court) and outlined ten questions plus "any other issue they deem relevant" for them to evaluate. *See Lake View Sch. Dist. No. 25 v. Huckabee,* 356 Ark. 1, 144 S.W.3d 741, 741–42 (2004). The masters were to conduct the inquiry in a fashion very similar to a proceeding at the trial court level. In a concurrence, Justice Glaze cautioned that simply appointing masters and authorizing them to conduct the fact-finding inquiry may "bog down in a mass of needless information." *Id.* at 743 (Glaze, J., concurring). Later that year, however, the court responded with high praise to the Arkansas legislature's efforts and released jurisdiction in the case. *Lake View Sch. Dist. No. 25 v. Huckabee,* 358 Ark. 137, 189 S.W.3d 1 (2004).